**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **CHICAGO & VICINITY LABORERS'** | ) | |
| **DISTRICT COUNCIL PENSION FUND,** | ) | |
| **CHICAGO & VICINITY LABORERS'** | ) | |
| **DISTRICT COUNCIL WELFARE FUND,** | ) | |
| **CHICAGO & VICINITY LABORERS'** | ) | |
| **DISTRICT COUNCIL RETIREE HEALTH** | ) | |
| **AND WELFARE FUND, and CATHERINE** | ) | |
| **WENSKUS, not individually but as** | ) | |
| **Administrator of the Funds,** | ) | |
| | ) | |
| | ) | **Case No. 25-cv-6703** |
| **Plaintiff,** | ) | |
| **and** | ) | **JUDGE BLAKEY** |
| | ) | |
| | ) | |
| | ) | |
| **WILLIAMS TUNNELING INDUSTRIES,** | ) | |
| **INC., a Missouri corporation** | ) | |
| **Defendant.** | ) | |

**MOTION FOR ENTRY OF DEFAULT JUDGMENT**
**PURSUANT TO RULE 55(b)**

Now come Plaintiffs, Laborers' Pension Fund and Laborers' Welfare Fund of the Health

and Welfare Department of the Construction and General Laborers' District Council of Chicago

and Vicinity, the Chicago Laborers' District Council Retiree Health and Welfare Fund, and

Catherine Wenskus, (collectively referred to hereinafter as the "Funds"), by and through their

attorney, G. Ryan Liska, and hereby move this Court for an entry of default judgment in sum

certain pursuant to Fed. R. Civ. P. 55(b) on Counts I and IV of the Funds' Complaint against

Defendant Williams Tunneling Industries, Inc. ("Company").  In support of this Motion, the

Funds state as follows:

1.      The Funds filed their Complaint on June 17, 2025 against the Company.  Count I

of the Complaint seeks to collect delinquent fringe benefit and dues contributions revealed as due

by a compliance audit of the Company's books and records for the period February 1, 2020 through June 30, 2024. Count IV alleges a breach of labor agreement as a result of the Company failing to post and maintain a $5,000.00 wage and fringe benefit bond. The Funds also seek to collect liquidated damages, interest, audit costs, reasonable attorneys' fees and costs and provided for in ERISA, the parties collective bargaining agreement and the Funds' Collection Policy.

2. The Funds move for a default judgment against the Company pursuant to Fed. R. Civ. P. 55(b) because they are requesting judgment on Counts I and IV. With the entry of the default judgment, the Funds will voluntarily dismiss Counts II and III pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). That dismissal will be included in the proposed default judgment order submitted with this Motion.

3. On August 13, 2025, the Court entered an Order of Default finding the Company in default for failing to file a responsive pleading as required by the Federal Rule of Civil Procedure. (Docket Entry 13).

4. As of the date of this filing, the Company failed to vacate the default, answer or otherwise plead.

5. Pursuant to Section 502(g)(2) of the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. § 1132(g)(2), Section 301 of the Labor Management Relations Act ("LMRA"), as amended, 29 U.S.C. §185, and the Agreement, the Funds' respective Agreements and Declarations of Trust and Funds' Restated Collection Policy, the Funds are entitled to judgment in the amount of $29,373.17 against the Company on Counts I and IV as follows:

A. As set forth in the Declaration of Michael Christopher filed contemporaneously herewith and attached hereto as Exhibit A, $22,339.92 in unpaid fringe benefit

and union dues contributions, liquidated damages, interest and audit costs are owed by the Company for the audit period February 1, 2020 through June 30, 2024  (See Exhibit A, ¶ 11-15);

B.    As set forth in the Declaration of Michael Christopher, the Company owes the Funds $5,000.00 as a result of failing to post the fringe benefit and wage bond; and

C.    As set forth in the Declaration of G. Ryan Liska, filed contemporaneously herewith and attached hereto as Exhibit B, the Funds incurred $1,484.00 in attorneys' fees and costs of $549.25.

WHEREFORE, Plaintiff Funds respectfully request that its motion for entry of default judgment pursuant to Fed. R. Civ. P. 55 (b) be entered against Defendant Williams Tunneling Industries, Inc. and in favor of Plaintiff Funds in the amount of $29,373.17 and for any other relief deemed just and equitable.

October 2, 2025

Respectfully submitted,
Laborers' Pension Fund, et al.

By: /s/ G. Ryan Liska

Office of Fund Counsel
111 W. Jackson Blvd., Suite 1415
Chicago, IL  60604
(312) 692-1540

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney of record certifies that he caused a copy of the foregoing

Plaintiffs' Motion for Entry of Default Judgment Pursuant to Rule 55(b) to be served upon the

following person(s) via U.S. First Class Mail and email, postage prepaid on this 2nd day of

October, 2025.

Williams Tunneling Industries, Inc
c/o Registered Agents, Inc.
117 South Lexington Street
Suite 100
Harrisonville, MO 64701


/s/ G. Ryan Liska

**FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CHICAGO & VICINITY LABORERS'          )
DISTRICT COUNCIL PENSION FUND,        )
CHICAGO & VICINITY LABORERS'          )
DISTRICT COUNCIL WELFARE FUND,        )
CHICAGO & VICINITY LABORERS'          )
DISTRICT COUNCIL RETIREE HEALTH       )
AND WELFARE FUND, and CATHERINE       )
WENSKUS, not individually but as      )
Administrator of the Funds,           )
                                      )
                                      )     Case No. 25-cv-6703
                      **Plaintiff,**  )
      **and**                         )     **JUDGE BLAKEY**
                                      )
                                      )
                                      )
WILLIAMS TUNNELING INDUSTRIES,        )
INC., a Missouri corporation          )
                      **Defendant.**  )

<u>**DECLARATION OF MICHAEL CHRISTOPHER**</u>

I, **MICHAEL CHRISTOPHER,** declare under the penalty of perjury that the foregoing

is true and accurate:

1.      I am a Field Representative employed by the Laborers' Pension Fund and the

Laborers' Welfare Fund of the Construction and General Laborers' District Council of Chicago

and Vicinity (hereinafter collectively referred to as the "Funds") and have held that position

since 1993. My responsibilities include monitoring the compliance of signatory contractors

financial obligations set forth in the parties Construction and General Laborers' District Council

of Chicago and Vicinity ("Union") collective bargaining agreement. ("CBA"). This Affidavit is

submitted in support of the Laborers' Funds' Motion for Default Judgment against Williams

Tunneling Industries, Inc. ("Company"). I have personal knowledge regarding the statements



contained herein.

2.     I am charged with monitoring the Company's compliance with the Agreement. These duties included collecting monthly fringe benefit and union dues reports and payments, collecting contributions found to be due in a payroll audit, creating summaries of liabilities in the event the Company becomes delinquent in its monthly reporting and payments, calculating liquidated damages assessed against late paid fringe benefit reports, monitoring compliance with the Company's bonding obligation and working the with Company to assist it in becoming current with its obligations.

3.     The Union and Company are parties to successive collective bargaining agreement, which carried the terms June 1, 2017 to May 31, 2021 and June 1, 2021 to May 31, 2026. ("CBA"). (A true and accurate copy of the "short form" CBA entered into between the Union and Company which CBA adopts and incorporates Master CBA between the Union and various employer associations, and also binds Company to the Laborers' Funds respective Agreements and Declarations of Trust is attached hereto as Exhibit A-1.)

4.     I am familiar with the Construction and General Laborers' District Council of Chicago and Vicinity's Independent Construction Industry Collective Bargaining Agreement, the Funds' respective Agreements and Declarations of Trust and the collection policies adopted by the Funds' Trustees.

5.     A copy of the CBA governing the relevant time period is attached as Exhibit A-2; a copy of the Amended Agreement and Declaration of Trust creating the Laborers' Pension Fund is attached as Exhibit A-3; a copy of the Amended Health and Welfare Department of the Construction and General Laborers' District Council is attached as Exhibit A-4; a copy of the Declaration of Trust creating the Laborers' District Counsel Retiree Health and Welfare Fund is

attached as Exhibit A-5; a copy of the Agreement and Declaration of Trust Establishing the Construction and General Laborers' District Council of Chicago and Vicinity Training Trust Fund is attached hereto as Exhibit A-6; a copy of the Funds' Restated Collection Policy is attached as A-7.

6. The Funds' Collection Policy provides contributions found owing pursuant to a payroll audit will be assessed liquidated damages at twenty percent (20%) of the contributions owed. (Exhibit A-7, Section D, ¶ 4).

7. The Funds' Collection Policy provides any delinquent contributions owed by a Contributing Employer shall bear interest in the amount of twelve percent (12%) per annum, compounded from the due date until the obligation is fully satisfied. (Exhibit A-7, Section E, ¶ 2).

8. The Funds' Collection Policy provides an employer shall bear the costs of a payroll audit if the Funds files a lawsuit to collect the audit delinquencies. (Exhibit A-7, Section F, ¶ 1).

9. The CBA also requires the Company to pay contributions to the Industry Funds. These contributions are paid as part of the Dues Reports. The CBA requires the Company to pay one cent (0.01) to the Construction Industry Service Fund ("CISCO"), one cent (0.01) per hour to the Chicagoland Construction Safety Council and six cents (0.06) to the Industry Advancement Fund (collectively "IAF"). (Exhibit A-2, Article X, ¶ 1 & 4 pp. 30-31).

10. On May 20, 2025, I mailed the Company a copy of the fringe benefit and union dues compliance audit findings and requested the Company submit any challenges by June 13, 2025. The Company failed to provide any challenges to the audit or remit payment. Pursuant to the Funds' Collection Policy, I referred the matter to the legal department.

11.     In addition to collection duties, I am responsible for reviewing payroll audit and preparing summaries of amounts due.   A true and accurate copy of the Company's payroll audit findings for the period February 1, 2020 through June 30, 2024 is attached as Exhibit A-8.   Based upon my review of the Exhibit A-8 audit I prepared a summary of amounts due which is attached as Exhibit A-9.

12.     An itemization of the amounts due to the respective ERISA and Industry Funds is as follows:

a)     Welfare Fund- $4,361.00
b)     Pension Fund -$5,738.80
c)     Retiree Fund-  $1,977.12
d)     Training Fund-$  333.26
e)     Industry Fund-$   25.78
f)     CISCO Fund-  $    3.70

(See Exhibit A-9 Summary)

13.     In addition, the Company owes liquidated damages of $2,487.93, audit costs of $4,627.00 and interest of $2,785.33.   The total amount due from the Company is $22,339.92. (See Exhibit A-8 Summary).

14.     Article VI of the CBA provides all signatory employers shall maintain a surety bond in a form and amount satisfactory to the Union, but not less than $5,000.00 to guarantee the payment of wages, pension and welfare contributions. (Exhibit A-2, Article VI, ¶ 1 p. 35).

15.     As of the date of this Declaration, the Company has not posted the $5,000.00 wage and fringe benefit bond required by the CBA.

Dated: 8-15-2025

Michael Christopher



# CONSTRUCTION & GENERAL LABORERS'
# DISTRICT COUNCIL OF CHICAGO AND VICINITY

AFFILIATED WITH THE LABORERS' INTERNATIONAL UNION OF NORTH AMERICA

999 McCLINTOCK DRIVE • SUITE 300 • BURR RIDGE, IL 60527 • PHONE: 630/655-8289 • FAX: 630/655-8053

---

## INDEPENDENT CONSTRUCTION INDUSTRY COLLECTIVE BARGAINING AGREEMENT

It is hereby stipulated and agreed by and between __WILLIAMS TUNNELING INDUSTRIES INC.__ ("Employer") and the Construction and General Laborers' District Council of Chicago and Vicinity, Laborers' International Union of North America ("Union"), representing and encompassing its affiliated Local Unions, including Local Nos. 1, 2, 4, 5, 6, 25, 75, 76, 96, 118, 149, 152, 225, 269, 288, 582, 681, 1001, 1035, 1092, together with any other Local Unions that may come within its jurisdiction ("Local Unions"), and encompassing the geographic areas of Cook, Lake, DuPage, Will, Grundy, Kendall, Kane, McHenry and Boone counties, Illinois, that:

1. Recognition. In response to the Union's request for recognition as the majority or Section 9(a) representative of the unit employees, the Employer recognizes the Union as the sole and exclusive collective bargaining representative under Section 9(a) of the NLRA, as amended, for the employees now and hereinafter employed under the terms of this Agreement with respect to wages, hours and other terms and conditions of employment. This recognition is based on the Union's having shown, or having offered to show, evidence of its majority support. The Employer has not assigned its rights for purposes of collective bargaining with the Union to any person, entity or association, and hereby revokes its prior assignment of bargaining rights, if any. The Employer further voluntarily elects not to assign such bargaining rights to any person, entity or association without written approval from the Union. Notwithstanding the number of persons employed under this Agreement, the Employer shall abide by this Agreement, and all extensions hereof, and it waives any right it may have to terminate this agreement based upon the number of persons employed.

2. Labor Contract. The Employer affirms and adopts the applicable Collective Bargaining Agreement(s), as designated by the Union, between the Union and the Builders Association, the Chicago Area Independent Construction Association, the Chicago Area Rail Contractors Association, the Chicago Area Scaffolding Association, the Chicago Demolition Contractors' Association, the Concrete Contractors Association of Greater Chicago, the Contractors Association of Will and Grundy Counties, the Fox Valley Associated General Contractors, the Midwest Wall and Ceiling Contractors, the Illinois Environmental Contractors Association, the Illinois Road and Transportation Builders Association, the Illinois Small Pavers Association, the Lake County Contractors Association, the Mason Contractors Association of Greater Chicago, the Underground Contractors Association, and all other employer associations with whom the Union or its affiliated Local Unions have an agreement. If the applicable Collective Bargaining Agreement(s) expire during the term of this Agreement, any limitation on the right to strike shall also expire until a successor labor agreement has been established, which shall be incorporated retroactively herein. This Agreement supersedes all contrary terms in the applicable Collective Bargaining Agreement(s).

3. Total economic increase. The Employer shall pay its employees a total economic increase of $1.90 per hour effective June 1, 2013; $2.00 per hour effective June 1, 2014; $2.05 per hour effective June 1, 2015; and $2.10 per hour effective June 1, 2016, said amounts to be allocated between wages, fringe benefits and other funds by the Union in its sole discretion. Effective June 1, 2013, the minimum wage rate shall be $37.00 per hour

4. Checkoff Deductions and Remittances. The Employer shall deduct from the wages of employees uniform initiation fees, assessments, membership dues, and working dues in such amounts as the Union shall from time to time establish, and shall remit monthly to the designated Union office the sums so deducted, together with an accurate list showing the employees from whom dues were deducted, the employees' individual hours, gross wages and deducted dues amounts for the monthly period, not later than the tenth (10th) day of the month following the month for which said deductions were made. If the Employer fails to timely remit any amounts to the Union or its affiliated fringe benefit funds that are required under this Agreement, it shall be obligated to the Union for all costs of collection, including attorney fees.

The Employer shall further deduct an amount designated by the Union for each hour that an employee receives wages under the terms of this Agreement on the basis of individually signed voluntary authorized deduction forms and shall pay over the amount so deducted to the Laborers' Political League ("LPL") or to a designated appointee, not later than the 10th day of the month next following the month for which such deductions were made. LPL remittances shall include a report of the hours worked by each Laborer for whom deductions are made. Remittances shall be made by a separate check payable to the Laborers' Political League. The Employer shall be paid a processing fee each month from the total amount to be transmitted to the LPL to be calculated at the Illinois Department of Revenue or other applicable standard.

5. Work Jurisdiction. This Agreement covers all work within the applicable Collective Bargaining Agreements and all work within the Union's trade and geographic jurisdiction as set forth in the Union's Statement of Jurisdiction, as amended from time to time, which are incorporated by reference into this Agreement. The Employer shall assign all work described therein to its Union-represented Laborer employees and acknowledges the appropriateness of such assignment. Neither the Employer nor its work assignments as required under this Agreement shall be stipulated or otherwise subject to adjustment by any jurisdictional disputes board or mechanism except upon written notice by and direction of the Union.

6. Subcontracting. The Employer, whether acting as a contractor, general manager or developer, shall not contract or subcontract any covered work to be done at the site of construction, alteration, painting or repair of a building, structure or other work to any person, corporation or entity not signatory to and covered by a collective bargaining agreement with the Union. This obligation applies to all tiers of subcontractors performing work at the site of construction. The Employer shall further assume the obligations of all tiers of its subcontractors for prompt payment of employees' wages and other benefits required under this Agreement, including reasonable attorneys' fees incurred in enforcing the provisions hereof.

7. Fringe Benefits. The Employer agrees to pay the amounts that it is bound to pay under said Collective Bargaining Agreements to the Health and Welfare Department of The Construction and General Laborers' District Council of Chicago and Vicinity, the Laborers' Pension Fund (including Laborers' Excess Benefit Funds), the Fox Valley Benefit Funds, the Construction and General Laborers' District Council of Chicago and Vicinity Apprentice and Training Trust Fund, the Chicago Area Laborers-Employers Cooperation Education Trust, the LDC/LMDC, and to all other designated Union-affiliated benefit and labor-management funds (the "Funds"), and to become bound by and be considered a party to the agreements and declarations of trust creating the Funds as if it had signed the original copies of the trust instruments and amendments thereto. The Employer further affirms that all prior contributions paid to the Welfare, Pension, Training and other Funds were made by duly authorized agents of the Employer at all proper rates, and evidence the Employer's intent to be bound by the trust agreements and Collective Bargaining Agreements in effect when the contributions were made, acknowledging the report form to be a sufficient instrument in writing to bind the Employer to the applicable collective bargaining agreements.

8. Contract Enforcement. All grievances filed by either party arising hereunder shall, at the Union's discretion, be submitted to the Chicago District Council Grievance Committee for final and binding disposition in lieu of another grievance committee, provided that deadlocked grievances shall be submitted to final and binding arbitration upon timely demand. Should the Employer fail to comply within ten (10) days with any binding grievance award, whether by grievance committee or arbitration, it shall be liable for all costs and legal fees incurred by the Union to enforce the award. Notwithstanding anything to the contrary, nothing herein shall limit the Union's right to strike or withdraw its members because of non-payment of wages and/or fringe benefit contributions, failure by the Employer to timely remit dues to the Union, or non-compliance with a binding grievance award. The Employer's violation of any provision of this paragraph will give the Union the right to take any other legal and economic action, including but not limited to all remedies at law or equity. It is expressly understood and agreed that the Union's right to take economic action is in addition to, and not in lieu of, its rights under the grievance procedures. Where necessary to correct contract violations, or where no acceptable steward is currently employed, the Union may appoint and place a steward from outside the workforce at all job sites.

9. Successors. In the event of any change in the ownership, management or operation of the Employer's business or substantially all of its assets, by sale or otherwise, it is agreed that as a condition of such sale or transfer that the new owner or manager, whether corporate or individual, shall be fully bound by the terms and conditions of this Agreement. The Employer shall provide no less than ten (10) days' prior written notice to the Union of the sale or transfer and shall be obligated for all expenses incurred by the Union to enforce the terms of this paragraph.

10. Termination. This Agreement shall remain in full force and effect from June 1, 2013 (unless dated differently below) through May 31, 2017, and shall continue thereafter unless there has been given written notice, by certified mail by either party hereto, received no less than sixty (60) nor more than ninety (90) days prior to the expiration date, of the desire to modify or amend this Agreement through negotiations. In the absence of such timely and proper notice the Employer and the Union agree to be bound by the new applicable association agreement(s), incorporating them into this Agreement and extending this Agreement for the life of the newly negotiated agreements, and thereafter for the duration of successive agreements, unless and until timely notice of termination is given not less than sixty (60) nor more than ninety (90) days prior to the expiration of each successive Collective Bargaining Agreement.

11. Execution. The signatory below warrants his or her receipt of the applicable Collective Bargaining Agreement(s) and authorization from the Employer to execute this Agreement, without fraud or duress, and with full knowledge of the obligations and undertakings contained herein. The parties acknowledge and accept facsimile signatures on this Agreement as if they were the original signatures.

Dated: __8/30/2016__, 20 16

ACCEPTED:
Laborers' Local Union No. __LDC__

By: _____

CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY

By: _____
James P. Connolly, Business Manager

By: _____
Charles LoVerde, Secretary-Treasurer

For Office Use Only: __IM-UCA__

__Williams Tunneling Industries Inc__
(Employer)

FEIN No.: _____

By: __Edison Williams, President__
(Print Name and Title)

__Edison Williams__
(Signature)

__800 North Tucker Blvd__
(Address)

__SAint Louis MO 63101__
(City, State and Zip Code)

__832-889-1468__
(Telephone/Facsimile)

__Williamsedison@yahoo.com__
(Email Address)

**EXHIBIT**

**A-1**

Effective June 1, 2013      WHITE - LOCAL UNION   •   CANARY - TRUST FUND   •   PINK - DISTRICT COUNCIL   •   GOLD - EMPLOYER

**JUNE 1, 2021 TO MAY 31, 2026**

## SEWER AND TUNNEL AGREEMENT

between the

**UNDERGROUND CONTRACTORS ASSOCIATION**

Represented by the

**MID-AMERICA REGIONAL BARGAINING ASSOCIATION**

and the

**CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY**

EXHIBIT A2

1

**TABLE OF CONTENTS**

| Article | | Page |
|---|---|---|
| | PURPOSE OF AGREEMENT | 6 |
| | DECLARATION OF FUNDAMENTAL PRINCIPLES | 7 |
| I | RECOGNITION | 8 |
| II | JURISDICTION | 9 |
| | Territorial Scope of Agreement | 9 |
| | Subcontracting | 9 |
| | Trade Jurisdiction | 10 |
| | Jurisdictional Dispute | 14 |
| III | UNION SECURITY | 14 |
| | Job Notification and Pre-Job Conference Notification (Tunnel Work Only) | 15 |
| | Pre-Job Conferences (Non-Tunnel Work) | 16 |
| IV | CHECK-OFF & DUES DEDUCTIONS | 16 |
| V | WAGES, HEALTH AND WELFARE AND PENSION FUNDS AND PAYMENTS | 18 |
| | Wages (Sewer Work) | 19 |
| | Wages (Tunnel Work) | 20 |
| | Dosimeter Use | 22 |
| | Power Pac | 22 |
| | Manner of Payment | 22 |
| | Direct Deposit | 22 |
| | Westchester Health and Welfare | 22 |
| | Westchester Pension Fund | 23 |
| | Fox Valley Health and Welfare | 26 |
| | Fox Valley Pension Fund | 29 |
| | Reciprocity | 32 |
| | Section 415 Excess Benefit Fund | 32 |
| | Chicagoland Laborers' Vacation Fund | 33 |
| | Chicagoland Laborers' Annuity Fund | 33 |
| | Supervisors | 33 |
| | Out of Town Work | 34 |

2

| Article | | Page |
|---|---|---|
| | Special Rules for Bonding . . . . . . . . . . . . . . . | 34 |
| | Withdrawal of Employees . . . . . . . . . . . . . . . | 35 |
| VI | BONDING TO GUARANTEE WAGE PAYMENTS AND WELFARE AND PENSION CONTRIBUTIONS . . . . . . . . . . . | 35 |
| | Withdrawal of Employees . . . . . . . . . . . . . . . | 36 |
| VII | INDUSTRY FUNDS. . . . . . . . . . . . . . . . . . . . | 37 |
| VIII | WORK HOURS - OVERTIME - HOLIDAYS, ELECTION DAYS . . . . . . . . . . . . | 38 |
| | Hours . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 38 |
| | Overtime . . . . . . . . . . . . . . . . . . . . . . . . . . | 38 |
| | Holidays . . . . . . . . . . . . . . . . . . . . . . . . . . | 39 |
| | Election Days . . . . . . . . . . . . . . . . . . . . . . . | 40 |
| IX | SHIFT WORK . . . . . . . . . . . . . . . . . . . . . . . | 40 |
| | Shift Differential . . . . . . . . . . . . . . . . . . . . | 41 |
| X | WORK RULES AND CONDITIONS . . . . . . | 41 |
| | Reporting Time Pay . . . . . . . . . . . . . . . . . . | 41 |
| | Workday . . . . . . . . . . . . . . . . . . . . . . . . . . | 41 |
| | Safety and Sanitation . . . . . . . . . . . . . . . . . | 42 |
| | Tools and Equipment . . . . . . . . . . . . . . . . . | 42 |
| | Worker's Compensation . . . . . . . . . . . . . . . | 43 |
| | Non-Discrimination . . . . . . . . . . . . . . . . . . | 43 |
| | Rights of Parties . . . . . . . . . . . . . . . . . . . . | 43 |
| | Payment Disputes . . . . . . . . . . . . . . . . . . . | 43 |
| | Liquidated Damages . . . . . . . . . . . . . . . . . . | 44 |
| | Key Man . . . . . . . . . . . . . . . . . . . . . . . . . | 44 |
| | Access to Premises . . . . . . . . . . . . . . . . . . | 44 |
| | Public Health Emergencies . . . . . . . . . . . . . | 45 |
| XI | STEWARDS . . . . . . . . . . . . . . . . . . . . . . . . | 45 |
| XII | FOREMEN - SUB-FOREMAN . . . . . . . . . . | 46 |
| XIII | TRAINING APPRENTICE PROGRAM . . . . | 47 |
| | Apprenticeship Committee . . . . . . . . . . . . . | 47 |

3

| Article | | Page |
|---|---|---|
| | Apprenticeship and Training Fund | 47 |
| | Mandatory Apprenticeship | 49 |
| XIV | SETTLEMENT OF DISPUTES | 49 |
| | Wage Audits | 52 |
| XV | ALCOHOL AND SUBSTANCE ABUSE | 52 |
| XVI | APPROVALS | 52 |
| | Employers' Warranty | 52 |
| | Execution | 53 |
| | Saving Clause | 53 |
| | SIGNATURE OF PARTIES | 53 |
| | ADDENDUM | 54 |
| | Construction Industry Service Corporation | |
| | Uniform Drug/Alcohol Abuse Program | |
| | Work Rules Committee | 59 |
| SIDE LETTER 1 | | 60 |
| SIDE LETTER 2 | | 60 |

**JUNE 1, 2021 TO MAY 31, 2026**

# SEWER AND TUNNEL AGREEMENT

between the

**UNDERGROUND CONTRACTORS ASSOCIATION**

Represented by the

**MID-AMERICA REGIONAL
BARGAINING ASSOCIATION**

and the

**CONSTRUCTION AND GENERAL
LABORERS' DISTRICT COUNCIL
OF CHICAGO AND VICINITY**

## AGREEMENT

This AGREEMENT made and entered in the City of Chicago, Cook, Lake, DuPage, Will, Grundy, Kendall, Kane, McHenry and Boone Counties, Illinois, (certain local unions covering Counties outside Cook and DuPage County may have local agreements which differ from this area-specimen agreement. In these cases, local area agreements shall prevail for work performed in the respective areas; however, nothing herein shall limit the geographic jurisdiction of this Agreement to less than the geographic area covered by the Laborers' District Council of Chicago and Vicinity), on the 1st day of June, 2021 by and between:

1) Construction and General Laborers' District Council of Chicago and Vicinity, for and on behalf of its affiliated Local Unions nos. 2, 5, 68, 75, 582 and 1035;

2) The Underground Contractors Association and their individual members having assigned bargaining representation to the Mid-America Regional Bargaining Association (hereinafter called the "Employer"); and

3) All other persons, firms, partnerships and corporations who have signed this Agreement, hiring men engaged in the trade (hereinafter described), individually and collectively (herein also called the "Employer"); shall remain in full force and effect until 11:59 P.M. May 31, 2026. Nothing in this Agreement restricts the areas where Laborers may work within the Union's geographic jurisdiction.

If either party wishes to modify this Agreement, it shall serve written notice by certified or registered mail, upon the other party not less than sixty (60) days prior to May 31, 2026 of its intent to begin negotiations for a new Agreement. In the absence of the service of such notice, this Agreement shall automatically renew itself, together with all amendments and improvements as negotiated after said initial expiration date, by and between the parties in area-wide bargaining, from year to year thereafter.

## W I T N E S S E T H:
### PURPOSE OF AGREEMENT

The purpose of this agreement is to prevent strikes and lockouts; to facilitate peaceful adjustment of grievances and disputes which might arise between Employer and Employees; to prevent waste and unnecessary and avoidable delays and expense; to provide employment in accordance with conditions hereinafter set forth, at the wages hereinafter agreed upon, so that stable and equitable conditions may prevail in such work and trade; and to establish the necessary procedure by which these ends may be accomplished.

**DECLARATION OF FUNDAMENTAL PRINCIPLES**

The following principles are hereby declared to be fundamental to this Agreement:

1) It is the intention of all the parties hereto to fully comply with the provisions of the Labor-Management Relations Act of 1947, and all acts amendatory thereto, anything to the contrary notwithstanding.

2) The Employer is at liberty to hire and discharge whomever he sees fit, consistent with the existing Federal, State and Municipal laws appertaining thereto.

3) In the absence of a Referral System, the Employer, should the need arise, shall notify the Union of opportunities of employment with such Employer; however, when not so notified by Employer of such opportunities of employment, the Union shall be extended the opportunity to refer qualified applicants for such employment.

4) There shall be no limitations or restrictions as to the amount of work a man shall be required to perform during a working day.

5) There shall be no restrictions of the use of machinery, tools or appliances.

6) The principles contained in this paragraph are fundamental, and no other terms of this Agreement shall be construed as being in conflict therewith.

7) The parties hereto desire to establish the necessary procedure to accomplish the purposes and put into effect the principles above stated.

8) The parties agree that Employees will not be discriminated against because of race, creed, religion, color, age, sex or national origin.

**THEREFORE, THE PARTIES HERETO MUTUALLY AGREE AS FOLLOWS:**

## Article I
## RECOGNITION

**Paragraph 1.** The UNDERGROUND CONTRAC-TORS ASSOCIATION and their individual members having assigned bargaining representation to the MID-AMERICA REGIONAL BARGAINING ASSOCIA-TION, recognizes and confirms the Union as the sole and exclusive bargaining agent for all Employees employed in work covered by the trade and territorial jurisdiction of the Union by Employers who are now members of the Association or such Employers as may hereafter become members of the Association and who have assigned bargaining authority to the Association or other Employers signatory to this Agreement for the purpose of collective bargaining with respect to rates of pay, wages, fringe benefits, hours of employment and other conditions of employment. The Union recognizes and confirms the Association as the sole and exclusive bargaining agent for its members and for such other persons, firms, partnerships and corporations as may hereafter become members of the Association and who have assigned bargaining authority to the Association.

**Paragraph 2.** All other persons, firms, partnerships and corporations, who are not members of the Association, who have signed this Agreement, recognize and confirm the Union and the Union recognizes and confirms the signatories individually or collectively as the sole respective bargaining agent for the purpose of collective bargaining with respect to rates of pay, wages, fringe benefits, hours of employment and other conditions of employment for all Employees employed by such signatory Employers who engage in work which comes within the trade and territorial jurisdiction of the Union.

**Paragraph 3.** All other persons, firms, partnerships and corporations, who are not members of the Association, or signatories hereto who engage in work which comes within the trade and territorial jurisdiction of the Union shall be subject to the terms of this Agreement.

8

## Article II
## JURISDICTION

**Paragraph 1. TERRITORIAL SCOPE OF AGREEMENT.** The area in which this Agreement shall apply shall cover all work in the Counties of Cook, Lake, DuPage, Will, Grundy, Kendall, Kane, McHenry and Boone Counties, Illinois, (certain local unions covering Counties outside Cook and Lake County may have local agreements which differ from this area-specimen agreement. In these cases, local area agreements shall prevail for work performed in the respective areas; however, nothing herein shall limit the geographic jurisdiction of this Agreement to less than the geographic area covered by the Laborers' District Council of Chicago and Vicinity), or within such other area as the Union may later establish lawful jurisdiction during the period of this Agreement.

**Paragraph 2.1 SUBCONTRACTING.** On work covered by this Agreement, the contractor or subcontractor agrees to see that all subcontractors on work within the Union's jurisdiction on this job site adhere to the wages and fringes contained in this Agreement when the subcontract is let by the contractor or subcontractor. If, upon the Union's request, the subcontractor chooses to sign a current labor agreement with the Union (although such signing might not be required under Paragraph 2.1), then the contractor shall be relieved of any liability under this Paragraph 2.1.

**Paragraph 2.2.** The Employer agrees that it will not contract or subcontract any work covered by this Agreement to be done at the site of construction, alteration, painting or repair of a building, structure or other work, except to a person, firm or corporation that is party to the applicable collective bargaining agreement with the Union.

**Paragraph 2.3.** If an Employer, bound to this Agreement, contracts or subcontracts any work covered by this Agreement to be done at the jobsite of the construction, alteration, painting or repair of a building, structure or other work to any person or proprietor who is not signa-

9

tory to this Agreement, the Employer shall require such subcontractor to be bound by all the provisions of this Agreement, or the Employer shall maintain daily records of the subcontractor's or the subcontractor's Employees jobsite hours and be liable for payments to the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity, the Laborers' Pension Fund, and the Construction and General Laborers' District Council of Chicago and Vicinity Joint Apprentice and Training Trust Fund as provided in Article V, Paragraphs 6-8 inclusive and Article XIII of this Agreement.

**Paragraph 3. TRADE JURISDICTION.** This Agreement shall apply to all Employers engaging Employees who perform any of the following work:

a) The digging and excavating for all sewers, catch basins, manholes, test holes, shafts and subways; the excavation for bridges and viaduct abutments; the excavation or the digging of trenches for, and the laying of, drain pipes, concrete pipes, water pipe extensions, water main taps, water main fusing, water mains from whatever source and beyond the first point of connection from building, conduits in which wire or cables are carried or run, all underground pipe transportation lines for gas, oil, gasoline, fluids and liquids, water aqueducts, and water lines and utilities, including temporary, of every description, including excavations or digging to uncover such utilities, drain pipes, concrete pipes, water pipes, water mains, sewer pipes, conduits and gas pipe lines for the purpose of relocation, removal, repair or alterations of such pipes, conduits or pipe lines; and all the temporary piping of every description in connection with excavating and underground construction; the handling, placing and bracing in position of all sheeting forms and steel reinforcing, including the driving thereof, and the welding and burning of same, putting on grout mortar on bottom of sewers about pumping stations, including the erection, alteration and remodeling of same; all common labor performed in connection with the erection, alteration,

10

remodeling, or demolition of bridges and viaducts, all installations of repairs to and removal of temporary ventilation pipes or water lines in underground work, sewer work or tunnels; the laying and connecting of all non-metallic and metallic pipes; the rodding of all sewer, drain and conduit pipes or systems; and all common labor performed on or about, or in connection with the mixing or handling of materials on any of the work above set forth.

(b) All work performed in free or compressed air in shafts and tunnels for piping, sewers, water, subways (mass transportation systems of all kinds), transporting, diversion, storage, shelters, aquifers and all other types of reservoirs, related to water pollution projects, and all other types of reservoirs, caissons, cofferdams, dikes, dams, levees, culverts, flood control projects, pilings, soil test borings, ground water well test holes, seismograph testing of subsurface, geology, excavation for subsurface installations of industrial, manufacturing, commercial, military, federal, state, county and municipal governmental facilities of every type and description, missile and anti-missile silo shafts, and underground construction for the preparation of the installation of atomic smashing accelerations and appurtenances; and all other underground structures of every type, nature and description in free or compressed air.

(c) The work covered by this Agreement shall be classified as follows: All preparatory work, including the excavating, bracing, drilling and blasting (handling of all powder, including splitting and making of primers), mucking and removal of material from the tunnels and shafts; the cutting, drilling and installations of materials used for timbering or re-timbering, lagging bracing, propping or shoring the shaft or tunnel, and all welding incidental thereto; assembly and installation of multiplate, liner plate, rings, mesh, mats or forms for any tunnel or shaft, including the setting of rods for same; pouring, pumpcreting and guniting of concrete in any tunnel or shaft; the operation, manual or hydraulic jacking of shields and the use of such other mechanical equipment as

11

may be necessary; all concrete work described as above, and in addition thereto, the hooking on, signaling and dumping of concrete for work over on caissons, pilings, abutments, etc.; the installation of pipe, gratings and grill work for drains or other subsurface purposes; the installation of well points or any other dewatering systems; and also all alterations, maintenance and demolition work on all underground projects; and all other work covered by classifications hereinafter enumerated in Article V herein.

(d) **Compressed Air:** In compressed air, all work underground or in compression chambers, including tending of the outer air lock, shall be covered by this agreement; all construction work in compressed air including, but not limited to, grout men, track men, drillers, shield drivers, miners, lock tenders, muckers, and mucking machine, motor men, rod men, laser beams, compressed air electricians, liner plate setters, ring setters, dynamite men or blasters, air hoist, form men, concrete blower, concrete laborers, power knives, erectors, key boards, agitator car, car pushers, grout machines, steel setters, cage tenders, skinners, track layers, dump men, timber men or bracers, cherry pick men, nippers, chuck tenders and cable tenders, vibrator men, jet gunmen, gunmen, gunite nozzle men, and all other types of work connected therewith shall be covered by this Agreement.

**PERIOD AND INTERVALS OF WORK
FOR EACH TWENTY-FOUR HOUR PERIOD**

| Pressure | | Periods | Compression and Decompression |
|---|---|---|---|
| More than Minimum number of pounds Column 1 | Not more than maximum number of pounds Column 2 | Maximum total hours Column 3 | See Current OSHA Regulations |
| Normal | 15 | 8 | |
| 16 | 26 | 6 | |
| 27 | 33 | 4 | |
| 34 | 38 | 3 | |
| 39 | 43 | 2 | |
| 44 | | 1 | |

The Employer may determine the time of each period when the pressure is not more than fifteen pounds per square inch, provided that the total for the periods does not exceed eight hours and does not conflict with OSHA regulations. The limits or hours as specified in said table shall apply accordingly to the maximum pressure attained at any time during the period.

(e) **Concrete and Asphalt Testing and Quality Control.** All work in connection with quality assurance/quality control and the collection and testing of construction materials and soil samples for the purposes of quality control/quality assurance. (Concrete and Asphalt Testing and Quality Control shall not be subject to the subcontracting restrictions in Article II).

(f) **Inspection, Maintenance and Repair of Underground Utilities, and Sewers.** All underground and preparatory work, which includes televised inspections, telegrouting, root cutting, herbicide application, lining, vacuuming, vacuum excavation, and jetting, in new or existing utilities, water mains, structures, shafts, tunnels,

13

sewers, drains, pipes and related structures of every character and description; all work performed on the ground when excavating with a vac-truck.

(g) **Scaffolds.** Erection, planking, maintenance and removal of all scaffolds and windbreaks for lathers, plasterers, bricklayers, masons and other construction trade crafts. Building planking or installation and removal of all staging, swinging, tubular and hanging scaffolds, including maintenance thereof.

**Paragraph 4. JURISDICTIONAL DISPUTES.** In the event of a jurisdictional dispute over any of the work covered under this Agreement that cannot be adjusted by both parties to this Agreement and the contending party, and if a binding authority recognized by the Union determines the work to be definitely the jurisdiction of some other union, then the parties shall jointly abide by such determination; provided that in the event the decision is appealed by the Union, this provision shall not be applicable until such time as the final decision issues.

### Article III
### UNION SECURITY

All Employees who are members of the Union on the effective date of this Agreement shall be required to remain members in good standing as a condition of employment during the term of this Agreement. All other Employees shall be required to become and remain members of the Union in good standing as a condition of continued employment from and after the eighth day following the beginning of his employment or the effective date of this Agreement, whichever is later. For the purpose of this Agreement, an Employee shall be considered a member of the Union in good standing, provided he is not delinquent in tendering payment of his periodic union dues and the initiation fees uniformly required by the Union as a condition of membership. If any Employee shall fail to comply with the membership requirements of this Agreement, the Union may notify the Employer to discharge such

14

Employee. The Employer agrees that he will discharge such Employee when notified in writing by the Union that such Employee has failed to comply with the membership requirements of this Agreement. The Union, by written notice served by registered mail upon the Employer, may demand the discharge of said Employee, specifically stating the basis of said demand, and subject at all times to the Union guarantee to defend, save harmless and indemnify the Employer from any claims or damages accruing to the Employee as a result of the wrongful discharge demand by the Union. The foregoing in all other aspects shall be subject to existing and applicable Federal and state laws governing labor management relations. This Union security provision shall be subject to immediate negotiation with the Employer as to any further changes permissible under future legal authority.

### JOB NOTIFICATION AND
### PRE-JOB CONFERENCE NOTIFICATION
**(Tunnel Work Only)**

1) Immediately upon obtaining a job, the Employer shall notify the Local Union with jurisdiction over the job, describing the size, location and length of the proposed job and the starting time thereof, at least one (1) week prior to the proposed starting date, for the purpose of arranging a pre-job conference.

2) The Employer or his authorized representatives, the District Council, and the Local Union involved shall hold the aforesaid pre-job conference so that the start and continuation of the work may progress without interruption. It shall be the purpose of the pre-job conference to agree upon such matters as the applicable work week and establish starting time, the number of men to be employed, including the number of key men required by the Employer, the method of referral, whether or not there will be a check off of Union initiation fees and dues, or Agency fees, the applicable wage rates and other matters, not including the interpretation of this Agreement it being agreed that any interpretation of this Agreement,

15

should be made between the principal parties hereto so that proper application thereof may be made on the jobs.

3) The Union and the Employer Associations agree to send a copy of this Agreement to all of their affiliates so that the work covered by this Agreement may be performed in an effective and peaceful manner and the Union agrees that the terms of this Agreement shall be recognized by its affiliated District Councils and Local Unions.

## PRE-JOB CONFERENCES
### (Non-Tunnel Work Only)

If the Union elects, a pre-job conference prior to commencement of work shall be held or if need is for additional men after the job has started, then the conference shall be held before the additional hiring commences if the Union elects. At the pre-job conference, the Employer shall advise the Union of its requirements as to workmen required in the respective classifications, the probable starting date, duration of the job, subcontractors, and working schedules.

## Article IV
### CHECK-OFF & DUES DEDUCTIONS

**Paragraph 1.** Employers also agree to deduct from the gross payroll earnings payable to an Employee covered by this Agreement, initiation fees and quarterly Union dues insofar as permitted by state and federal laws upon receipt and in accordance with a duly executed authorization form from the Employees. Said authorization form shall not be revocable for a period of more than one (1) year or prior to the termination date of this Agreement, whichever occurs sooner.

**Paragraph 2.** All Employers covered by this Agreement shall deduct from the gross payroll earnings of Employees covered by said contract, working dues in the amount designated by the Union and shall remit monthly to the Union office the sums so deducted, together with an accurate list of Employees from whose wages said dues

were deducted and the amounts applicable to each Employee, not later than the 10th day of the month next following the month for which such deductions were made. Dues remittance reports shall include a report of the hours worked and wages earned by each Laborer. Employers who fail to timely remit Union dues shall be assessed an additional ten percent (10%) liquidated damages. The Union shall give thirty (30) days' prior written notice to the Employer of any change in the rate of dues to be deducted and remitted.

**Paragraph 3.** It is the intention of the parties that such deductions shall comply with the requirements of Section 302(c)(4) of the Labor Management Relations Act of 1947, as amended, and that such deductions be made only pursuant to written assignments from each Employee on whose account such deductions are made, which assignment shall not be revocable for a period of more than one (1) year, or prior to the termination date of this Agreement, whichever occurs sooner.

**Paragraph 4.** The Union agrees that it will indemnify and hold harmless the Employer from any and all claims, suits, causes of action, or otherwise, as regards the creation and administration of the dues check-off established by this Section and such indemnity and agreement to hold harmless shall include the payment of costs and attorneys' fees on behalf of the beneficiaries of such indemnity.

**Paragraph 5.** Should any Employer fail to remit dues to the Union as required under this Agreement, the Employer shall be liable for and pay all costs of collection, including reasonable audit expenses and reasonable attorney fees and costs. The Union may file suit, or remove Employees that it represents, or both, for non-remittance or underpayment of dues by an Employer.

**Paragraph 6.** Effective June 1, 2022, the Employer shall submit monthly dues remittance reports to the Union through the District Council web portal.

### Article V
### WAGES, HEALTH AND WELFARE AND PENSION
### FUND AND PAYMENTS THEREOF

**Paragraph 1. WAGES.** The scale of hourly wage rates for Sewer Work, Drain Work, Manholes, Water Pipes, Conduit Pipes and Systems and other related tunnel and non-tunnel work shall be increased by two dollars and forty-five cents ($2.45) per hour effective June 1, 2021 to May 31, 2022, two dollars and fifty cents ($2.50) per hour total economic increase effective June 1, 2022 to May 31, 2023, two dollars and fifty-five cents ($2.55) per hour total economic increase effective June 1, 2023 to May 31, 2024, two dollars and sixty cents ($2.60) per hour total economic increase effective June 1, 2024 to May 31, 2025 and two dollars and sixty-five cents ($2.65) per hour total economic increase effective June 1, 2025 to May 31, 2026.

For the economic increases listed above, the Union shall also have discretion to allocate to another fund(s) to be established, up to a maximum of thirty cents ($0.30) per hour over the term of the Agreement (up to twelve cents ($0.12) in the first year and up to eighteen cents ($0.18) over the remaining years). The fund(s) shall indemnify and hold harmless Employers who have assigned their bargaining rights to a MARBA-represented Association for purposes of collective bargaining with the Union, and the MARBA-represented Associations party to this Agreement, and MARBA, as regards the creation, implementation and operation of the fund(s), other than the obligation to contribute the designated amounts to the fund(s), and such indemnity and hold harmless shall include the payment of all reasonable costs and attorney's fees actually incurred on behalf of the Employer. The Employer shall give prompt notice to the fund(s) of any claims asserted or suits filed that are subject to indemnification.

**SEWER WORK**

| CLASSIFICATION | 6/1/21 | 6/1/22 | 6/1/23 | 6/1/24 | 6/1/25 |
|---|---|---|---|---|---|
| | | $2.45 | $2.50* | $2.55* | $2.60* | $2.65* |
| Air Track Drill Operations | $46.25 | | *allocated by Union in its | | |
| Bottom Men . . . . . . . . . . . . | 46.25 | | discretion provided | | |
| Bracers-Bracing . . . . . . . . | 46.25 | | sufficient funds shall be | | |
| Bricklayers Tenders . . . . . . | 46.25 | | allocated to pension fund | | |
| Catch Basin Diggers . . . . . . | 46.25 | | to remain in green status | | |
| Drainlayers . . . . . . . . . . . . | 46.25 | | (See above paragraph) | | |
| Dynamiters . . . . . . . . . . . . | 46.25 | | | | |
| Form Men . . . . . . . . . . . . . | 46.25 | | | | |
| Jackhammermen . . . . . . . . | 46.25 | | | | |
| Powerpack . . . . . . . . . . . . | 46.25 | | | | |
| Pipelayers . . . . . . . . . . . . . | 46.25 | | | | |
| Rodders . . . . . . . . . . . . . . | 46.25 | | | | |
| Welders and Burners . . . . . | 46.25 | | | | |
| Well Point System Men . . . | 46.25 | | | | |
| Cement Carriers . . . . . . . . | 46.125 | | | | |
| Cement Mixers . . . . . . . . . | 46.125 | | | | |
| Concrete Repairmen . . . . . . | 46.125 | | | | |
| Mortar Men . . . . . . . . . . . . | 46.125 | | | | |
| Scaffold Men . . . . . . . . . . | 46.125 | | | | |
| Second Bottom Men . . . . . . | 46.125 | | | | |
| Concrete Laborers . . . . . . . | 46.025 | | | | |
| Steel Setters . . . . . . . . . . . | 46.025 | | | | |
| Signal Men . . . . . . . . . . . . | 45.90 | | | | |
| Top Laborers . . . . . . . . . . | 45.90 | | | | |
| All Other Laborers . . . . . . . | 45.90 | | | | |

**Material Testing Laborer I**
(Hand coring and drilling for testing of materials; field inspection of
uncured concrete and asphalt) . . . 35.90

**Material Testing Laborer II**
(Field Inspection of welds, structural steel, fireproofing, masonry,
soil, facade, reinforcing steel, formwork, cured concrete, and
concrete and asphalt batch plants; adjusting proportions of
bituminous mixtures.) . . . . . . . . . 40.90

19

Apprentices (1st 6 months) . . . . . . . . . . . . 60% of base rate: ($27.54)

Apprentices (2nd 6 months) . . . . . . . . . . 70% of base rate: ($32.13)

Apprentices (3rd 6 months) . . . . . . . . . . . 80% of base rate: ($36.72)

Apprentices (4th 6 months) . . . . . . . . . . . 90% of base rate: ($41.31)

Apprentices (after 24 months) . . . . . . . . . 100% of base rate: ($45.90)

The premium over and above wages and classifications for all Employees working in compressed air should be as follows:

| | |
|---|---|
| 0 - 15 pounds | $1.00 per hour |
| 16 - 20 pounds | $1.50 per hour |
| 21 - 26 pounds | $2.00 per hour |
| 27 - 33 pounds | $3.00 per hour |
| 34 and over | $4.00 per hour |

**TUNNEL WORK**

| CLASSIFICATION | 6/1/21 | 6/1/22 | 6/1/23 | 6/1/24 | 6/1/25 |
|---|---|---|---|---|---|
| | | $2.45 | $2.50* | $2.55* | $2.60* | $2.65* |
| Maintenance Technician . . . | $46.25 | | | | |
| Air Track Drill Operators . . . . | 46.25 | | | | |
| Miner . . . . . . . . . . . . . . . . . | 46.25 | | | | |
| Bricklayers Tenders . . . . . . . | 46.25 | | | | |
| Concrete Blower Operators . | 46.25 | | | | |
| Drillers . . . . . . . . . . . . . . . . | 46.25 | | | | |
| Dynamiters . . . . . . . . . . . . . | 46.25 | | | | |
| Erector Operators . . . . . . . . | 46.25 | | | | |
| Form Men . . . . . . . . . . . . . . | 46.25 | | | | |
| Jackhammermen . . . . . . . . . | 46.25 | | | | |
| Powerpack . . . . . . . . . . . . . | 46.25 | | | | |
| Mining Machine Operators . . | 46.25 | | | | |
| Mucking Machine Operators | 46.25 | | | | |
| Laser Beam Operators . . . . . | 46.25 | | | | |
| Liner Plate & Ring Setter . . . | 46.25 | | | | |
| Shield Driver . . . . . . . . . . . | 46.25 | | | | |
| Power Knife Operators . . . . . | 46.25 | | | | |
| Welders-Burners . . . . . . . . . | 46.25 | | | | |
| Pipe Jacking Machine Operators . . . . . . . . . . . . . | 46.25 | | | | |
| Skinners . . . . . . . . . . . . . . . | 46.25 | | | | |

*allocated by Union in its discretion provided sufficient funds shall be allocated to pension fund to remain in green status

(See above paragraph)

Concrete Repairmen . . . . . . . 46.125
Lock Tender (Pressure Side) 46.125
Mortar Men . . . . . . . . . . . . . 46.125
Muckers . . . . . . . . . . . . . . . 46.125
Grout Machine Operators . . . 46.125
Track Layers . . . . . . . . . . . . 46.125
Air Hoist Operators . . . . . . . 46.025
Key Board Operators . . . . . . 46.025
Car Pushers . . . . . . . . . . . . 46.025
Concrete Laborers . . . . . . . . 46.025
Grout Laborers . . . . . . . . . . 46.025
Lock Tenders (Free Air Side) 46.025
Steel Setters . . . . . . . . . . . . 46.025
Tuggers . . . . . . . . . . . . . . . 46.025
Switchmen . . . . . . . . . . . . . 46.025
Cage Tenders . . . . . . . . . . . 45.90
Dump Men . . . . . . . . . . . . . 45.90
Flagmen, Signalmen . . . . . . . 45.90
Top Laborers . . . . . . . . . . . 45.90
Rod Men . . . . . . . . . . . . . . 45.90

**Material Testing Laborer I**
(Hand coring and drilling for testing of materials; field inspection of
uncured concrete and asphalt) . . . . . .35.90

**Material Testing Laborer II**
(Field Inspection of welds, structural steel, fireproofing, masonry,
soil, facade, reinforcing steel, formwork, cured concrete, and
concrete and asphalt batch plants; adjusting proportions of
bituminous mixtures.) . . . . . . . . . . . .40.90

Paragraph 2. The scale of hourly wage rates for
Foremen and Sub-Foreman shall be as follows:

| CLASSIFICATION | 6/1/21 | 6/1/22 | 6/1/23 | 6/1/24 | 6/1/25 |
|---|---|---|---|---|---|
| | $2.45 | $2.50* | $2.55* | $2.60* | $2.65* |
| Sewer and Caisson Foremen . . . . . . . . . . . . .$47.00 | | | *allocated by Union in its | | |
| | | | discretion provided sufficient | | |
| Sewer and Caisson Sub-Foremen . . . . . . . . . . 46.70 | | | funds shall be allocated to pension fund to remain in green | | |
| Tunnel Foremen . . . . . . . . . 47.50 | | | status (See above paragraph) | | |

21

| | |
|---|---|
| Tunnel Sub-Foremen | 47.00 |
| General Foreman | 47.50 |
| Superintendent | 47.50 |

**Paragraph 3. DOSIMETER USE.** A premium of One ($1.00) Dollar per hour shall be paid to any Laborer required to work with a dosimeter used for monitoring nuclear exposure or with any similar instrument or measuring device.

**Paragraph 4. POWER PAC.** When a Laborer uses a power driven piece of equipment he shall be paid the rate of pay of the tool at the end of the power pac.

**Paragraph 5. MANNER OF PAYMENT.** Wages must be paid by payroll check and shall include a stub or statement showing the number of straight time and overtime hours worked and rate of pay.

**Direct Deposit.** In lieu of paying wages by payroll check, the Employer may make payment by electronic bank draft if the Employee voluntarily accepts such alternate method of payment. The Employer shall not mandate electronic banking as a condition of employment. Electronic wage payments must be transferred to the Employee's bank account no later than the Employee's regular pay day and at no cost to the Employee. If payment is made by electronic bank draft, the Employee must also be provided a record of hours worked, rates of pay, and deductions made, at the same time and containing the same information as if wages were paid by payroll check.

If full wages are not timely transferred to the Employee's account, the Employer shall pay the Employee an additional four (4) hours' pay for each day or portion thereof until full wages are received. Employers who violate the provisions of these paragraphs shall be denied the use of electronic banking for wage payments.

**Paragraph 6A. WESTCHESTER HEALTH WELFARE.** Employers that employ Employees who participate in the Health and Welfare Department of Construction and General Laborers' District Council of Chicago

22

and Vicinity may contribute directly to these funds in the amounts allocated for the Westchester Funds by the Union from the economic package and will be subject to the following.

Beginning the period from June 1, 2021 to May 31, 2022, the Employer agrees to make Health and Welfare contributions of sixteen dollars and fifty-five cents ($16.55) per hour for each hour worked by all Employees who are covered by this Agreement in addition to the wages herein stipulated. This sixteen dollars and fifty-five cents ($16.55) per hour shall be paid to the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity or a designated appointee at the end of each month.

That for the periods June 1, 2022 to May 31, 2023; June 1, 2023 to May 31, 2024; June 1, 2024 to May 31, 2025 and June 1, 2025 to May 31, 2026; that on May 1 of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training to be allocated from the economic package for that year. (See Article V, Paragraph 1).

The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity, as well as any amendments thereto.

**Paragraph 6B. WESTCHESTER PENSION FUND.** Employers that employ Employees who participate in the Laborers' Pension Fund may contribute directly to these funds in the amounts allocated for the Westchester Funds by the Union from the economic package and will be subject to the following.

Beginning June 1, 2021, the Employer agrees to make a pension contribution of fourteen dollars and seventy-one cents ($14.71) per hour for each hour worked by all Employees who are covered by this Agreement in addition to the wages and welfare payments herein stipulated.

23

This fourteen dollars and seventy-one cents ($14.71) per hour shall be paid to the Laborers' Pension Fund or to a designated appointee at the end of each month.

That for the periods June 1, 2022 to May 31, 2023; June 1, 2023 to May 31, 2024; June 1, 2024 to May 31, 2025 and June 1, 2025 to May 31, 2026, that on May 1 of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training to be allocated from the economic package for that year. (See Article V, Paragraph 1). The Union agrees that it shall allocate sufficient funds to the pension fund of the Union from the total economic package increases set forth above in each year of this agreement such that the pension fund remains in green status as defined by the Pension Protection Act of 2006, or any successor legislation.

The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Laborers' Pension Fund, as well as any amendments thereto.

The parties agree that the Employer shall make lump sum contributions to Employee fringe benefit accounts, administered by the Trustees on behalf of each Employee. It is further agreed that such contribution shall be accompanied by a breakdown of payment according to appropriate benefits.

Contributions to all fringe benefit funds under this Agreement shall be made in increments of no less than one-half hour for each half-hour or portion thereof an employee performs covered work.

The Trustees of the Welfare Fund and the Trustees of the Pension Fund shall, among other things, have authority to determine the type and amount of benefits to be provided in each of said funds, the eligibility rules governing entitlement to benefits, and whether and to what extent benefits are to be provided for covered Employees.

The failure of the Employer to contribute to the said Welfare or Pension Funds when the same is established, as

24

provided herein, shall for the purposes of the remedies the Union may pursue, be deemed the same as the failure of the Employer to pay wages, and the Union shall be permitted to remove workers whom they represent for non-payment of such contributions, anything to the contrary in this Agreement notwithstanding.

A grace period of thirty days (30) shall be granted for Employers to submit reports and contributions as provided. Said reports and contributions not received during this grace period shall be assessed liquidated damages amounting to ten (10%) percent of the amount of the contributions which are owed. The Employer acknowledges that the liquidated damages shall be used to defer administrative costs arising by said delinquency and acknowledges the costs to be actual and substantial, though difficult to ascertain. However, the Employer acknowledges these costs to be at a minimum of ten (10%) percent, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions shall bear interest at the maximum legal rate of interest per annum from the due date until they are paid.

Further, in the event the Trustees refer the account to legal counsel for collection, the delinquent Employer shall be liable for reasonable attorneys' fees, and for all reasonable costs incurred in the collection process, including court fees, audit fees, etc.

Reasonable attorneys' fees shall mean: All reasonable attorneys' fees in the amounts for which the Trustees become legally bound to pay, including recovery of liquidated damages, interests, audit costs, filing fees, and any other expenses incurred by the Trustees.

The Trustees of the aforementioned Welfare and Pension Funds and the Union shall have the authority to audit the books and records of a participating Employer, either directly or through their authorized representative, whenever such examination is deemed necessary for the purpose of compliance with the provisions of this Agreement, including the obligation to remit Union Dues under Article IV.

Each participating Employer shall make its books and records available to the Trustees for such purpose. In the event the audit discloses that the Employer, during the period of the audit, has underpaid its contributions and/or wages, the Employer shall be liable for the costs of the examination, including but not limited to, audit fees and reasonable attorneys' fees. The Trustees' authority to waive any costs shall be governed by the terms of the Trust Agreement.

Article III, Section 2 of the trust agreements of the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund shall be amended to include the following: "Association-appointed Trustees must be full-time Employees of contributing Employers within the Association's membership. A contributing Employer shall be defined as an Employer that has employed an average of five (5) or more Laborers performing bargaining unit work for whom contributions have been made per month in each of the previous three (3) calendar years."

The parties agree that the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund will be operated and administered by a board of trustees that is expanded to include eight (8) Employer and eight (8) Union trustees. Appointing authority for the two additional Employer trustees shall be vested with new Employer associations that currently are not party to the trust agreements and under whose labor agreements more than 20,000 hours of benefits were paid in 2005.

**Paragraph 7A. FOX VALLEY HEALTH AND WELFARE.** Employers that employ Employees who participate in the Fox Valley Laborers' Health and Welfare Fund may contribute directly to these funds in the amounts allocated for the Fox Valley Funds by the Union from the economic package and will be subject to the following.

26

Beginning the period from June 1, 2021 to May 31, 2022, the Employer agrees to make Health and Welfare contributions of fourteen dollars and thirty-six cents ($14.36) per hour for each hour worked by all Employees who are covered by this Agreement and participate in the Fox Valley Laborers' Health and Welfare Fund, in addition to the wages herein stipulated. This fourteen dollars and thirty-six cents ($14.36) per hour shall be paid to the Fox Valley Laborers' Health and Welfare Fund or a designated appointee at the end of each month.

That for the periods June 1, 2022 to May 31, 2023; June 1, 2023 to May 31, 2024 and June 1, 2024 to May 31, 2025, and June 1, 2025 to May 31, 2026; that on May 1 of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training to be allocated from the economic package for that year. (See Article V, Paragraph 1).

The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Fox Valley Laborers' Health and Welfare Fund, as well as any amendments thereto.

The parties agree that the Employer shall make lump sum contributions to Employee fringe benefit accounts, administered by the Trustees on behalf of each Employee. It is further agreed that such contribution shall be accompanied by a breakdown of payment according to appropriate benefits.

Contributions to all fringe benefit funds under this Agreement shall be made in increments of no less than one-half hour for each half-hour or portion thereof an employee performs covered work.

The Trustees of the Welfare Fund and the Trustees of the Pension Fund shall, among other things, have authority to determine the type and amount of benefits to be provided in each of said funds, the eligibility rules governing entitlement to benefits, and whether and to what extent benefits are to be provided for covered Employees.

27

The failure of the Employer to contribute to the said Welfare or Pension Funds when the same is established, as provided herein, shall for the purposes of the remedies the Union may pursue, be deemed the same as the failure of the Employer to pay wages, and the Union shall be permitted to remove workers whom they represent for non-payment of such contributions, anything to the contrary in this Agreement notwithstanding.

All reports and payments of contributions due to the respective fringe benefit funds shall be due on the tenth (10th) day of the month following the month in which the hours were worked.

A grace period of thirty (30) days shall be granted for Employers to submit reports and contributions as provided. Said reports and contributions not received during this grace period shall be assessed liquidated damages amounting to ten (10%) percent of the amount of the contributions which are owed. The Employer acknowledges that the liquidated damages shall be used to defer administrative costs arising by said delinquency and acknowledges the costs to be actual and substantial, though difficult to ascertain. However, the Employer acknowledges these costs to be at a minimum of ten (10%) percent, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions shall bear interest at a maximum legal rate of interest per annum from the due date until they are paid.

In the event the Trustees refer the account to legal counsel for collection, the delinquent Employer shall be liable for reasonable attorneys' fees, and for all reasonable costs incurred in the collection process, including court fees, audit fees, etc.

Reasonable attorneys' fees shall mean: All reasonable attorneys' fees in the amounts for which the Trustees become legally bound to pay, including recovery of liquidated damages, interests, audit costs, filing fees, and any other expenses incurred by the Trustees.

The Trustees of the aforementioned Welfare and Pension Funds and the Union shall have the authority to audit the books and records of a participating Employer, either directly or through their authorized representative, whenever such examination is deemed necessary for the purpose of compliance with the provisions of this Agreement, including the obligation to remit Union Dues under Article VI.

Each participating Employer shall make its books and records available to the Trustees for such purpose. In the event the audit discloses that the Employer, during the period of the audit, has underpaid its contributions and/or wages, the Employer shall be liable for the costs of the examination, including but not limited to, audit fees and reasonable attorneys' fees. The Trustees' authority to waive any costs shall be governed by the terms of the Trust Agreement.

**Paragraph 7B. FOX VALLEY PENSION FUND.** Employers that employ Employees who participate in the Fox Valley and Vicinity Laborers' Pension Fund may contribute directly to these funds in the amounts allocated for the Fox Valley Funds by the Union from the economic package and will be subject to the following.

Beginning June 1, 2021, the Employer agrees to make a pension contribution of sixteen dollars and ninety cents ($16.90) per hour for each hour worked by all Employees who are covered by this Agreement and participate in the Fox Valley and Vicinity Laborers' Pension Fund, in addition to the wages and welfare payments herein stipulated. This sixteen dollars and ninety cents ($16.90) per hour shall be paid to the Fox Valley and Vicinity Laborers' Pension Fund or to a designated appointee at the end of each month.

That for the periods June 1, 2022 to May 31, 2023; June 1, 2023 to May 31, 2024, June 1, 2024 to May 31, 2025, and June 1, 2025 to May 31, 2026 that on May 1 of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of addi-

29

tional contributions to Welfare and/or Pension and Training to be allocated from the economic package for that year. (See Article V, Paragraph 1). The Union agrees that it shall allocate sufficient funds to the pension fund of the Union from the total economic package increases set forth above in each year of this agreement such that the pension fund remains in green status as defined by the Pension Protection Act of 2006, or any successor legislation.

The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Fox Valley and Vicinity Laborers' Pension Fund, as well as any amendments thereto.

The parties agree that the Employer shall make lump sum contributions to Employee fringe benefit accounts, administered by the Trustees on behalf of each Employee. It is further agreed that such contribution shall be accompanied by a breakdown of payment according to appropriate benefits.

Contributions to all fringe benefit funds under this Agreement shall be made in increments of no less than one-half hour for each half-hour or portion thereof an employee performs covered work.

The Trustees of the Welfare Fund and the Trustees of the Pension Fund shall, among other things, have authority to determine the type and amount of benefits to be provided in each of said funds, the eligibility rules governing entitlement to benefits, and whether and to what extent benefits are to be provided for covered Employees.

The failure of the Employer to contribute to the said Welfare or Pension Funds when the same is established, as provided herein, shall for the purposes of the remedies the Union may pursue, be deemed the same as the failure of the Employer to pay wages, and the Union shall be permitted to remove workers whom they represent for non-payment of such contributions, anything to the contrary in this Agreement notwithstanding.

All reports and payments of contributions due to the respective fringe benefit funds shall be due on the tenth

30

(10th) day of the month following the month in which the hours were worked.

A grace period of thirty (30) days shall be granted for Employers to submit reports and contributions as provided. Said reports and contributions not received during this grace period shall be assessed liquidated damages amounting to ten (10%) percent of the amount of the contributions which are owed. The Employer acknowledges that the liquidated damages shall be used to defer administrative costs arising by said delinquency and acknowledges the costs to be actual and substantial, though difficult to ascertain. However, the Employer acknowledges these costs to be at a minimum of ten (10%) percent, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions shall bear interest at a maximum legal rate of interest per annum from the due date until they are paid.

In the event the Trustees refer the account to legal counsel for collection, the delinquent Employer shall be liable for reasonable attorneys' fees, and for all reasonable costs incurred in the collection process, including court fees, audit fees, etc.

Reasonable attorneys' fees shall mean: All reasonable attorneys' fees in the amounts for which the Trustees become legally bound to pay, including recovery of liquidated damages, interests, audit costs, filing fees, and any other expenses incurred by the Trustees.

The Trustees of the aforementioned Welfare and Pension Funds and the Union shall have the authority to audit the books and records of a participating Employer, either directly or through their authorized representative, whenever such examination is deemed necessary for the purpose of compliance with the provisions of this Agreement, including the obligation to remit Union Dues under Article VI.

Each participating Employer shall make its books and records available to the Trustees for such purpose. In the event the audit discloses that the Employer, during the

31

period of the audit, has underpaid its contributions and/or wages, the Employer shall be liable for the costs of the examination, including but not limited to, audit fees and reasonable attorneys' fees. The Trustees' authority to waive any costs shall be governed by the terms of the Trust Agreement.

**Paragraph 8. RECIPROCITY.** The parties agree that, whenever contributions are made on behalf of an Employee to welfare and pension funds that are not the home funds of the Employee, the funds receiving such contributions, in accordance with the funds' Reciprocity Agreement, shall transfer such contributions to the home funds and the home fund shall reallocate the contributions between such home funds in the amounts set forth herein.

Subject to the reciprocity provisions of this Article, contributions shall be remitted to the Fox Valley Laborers Health and Welfare Fund and Fox Valley and Vicinity Laborers Pension Fund for all hours worked by any laborer or for any person employed by the Employer doing labor or construction work as herein above defined in Article II hereof, within the jurisdiction of Locals 582 or 1035 or any successor locals covering Kane, Kendall, McHenry or Boone Counties, Illinois.

The foregoing, however, is not intended to and shall not interfere with the practices, requirements or understandings developed under the Fox Valley Agreements concerning those employees who participate in the Westchester Funds, which practices, requirements or understandings shall remain in effect and undisturbed.

**Paragraph 9. Section 415 EXCESS BENEFIT FUND.** A Section 415 Excess Benefit Fund shall be established for the purpose of providing alternative benefit to any Employees of the Employer who become unable to receive the entire amount of the accrued pension benefits to which they would be entitled under one or more of the pension plans sponsored by their Employer because of limitations established by Section 415 of the Internal

32

Revenue Code. The Employer may be required and directed by the Board of Trustees of the Excess Benefit Fund to contribute a portion of its agreed-upon "pension" contribution to the Section 415 Excess Benefit Fund and shall not increase the Employer's cost beyond the amount that the Employer is obligated to contribute to the Laborers' Pension Fund and that the funding of the Section 415 Excess Benefit Fund shall be fully tax deductible to the Employer for Federal Income Tax purposes. The Employer hereby agrees that the Board of Trustees of any such Section 415 Excess Benefit Fund shall be authorized to determine each year the amount that will be contributed by the Employer and the amount to be credited to the account of any eligible retiree for payment in lieu of accrued benefits that would exceed the limits set by Section 415 of the Internal Revenue Code.

**Paragraph 10. CHICAGOLAND LABORERS' VACATION FUND.** The Employer agrees to be bound by the Agreements and Declarations of Trust, as well as any amendments thereto, establishing the Chicagoland Laborers' Vacation Fund, a jointly-trusteed vacation plan established for the purpose of providing income to members during their winter layoffs. Contributions to the Fund will be allocated in the Union's sole discretion from the total economic increase.

**Paragraph 11. CHICAGOLAND LABORERS' ANNUITY FUND.** The Employer agrees to be bound by the Agreements and Declarations of Trust, as well as any amendments thereto, establishing the Chicagoland Laborers' Annuity Fund, a jointly-trusteed defined contribution plan providing a supplemental retirement benefit. Contributions to the Fund will be allocated in the Union's sole discretion from the total economic increase

**Paragraph 12. SUPERVISORS:** To the extent permissible by the Internal Revenue Service or any Federal Act, and for the purposes of Paragraphs 7 and 8 of Article V of this Agreement only, the bargaining unit shall also include those persons in the employ of an Employer who are supervisors, as defined in the Labor Management

33

Relations Act, as amended; and who at one time were Employee members of the bargaining unit herein on whose behalf contributions were required to be made to the trust funds described in the aforesaid Paragraph 7 and 8 of Article V hereof.

**Paragraph 13. OUT OF TOWN WORK.** When Laborers who reside or work in the nine-county geographic area covered by this Agreement are voluntarily requested to work at locations outside these nine counties, the Employer shall continue to report and pay benefits for all hours worked outside the nine counties. If the work performed is covered under a labor agreement with the Laborers' International Union of North America or its affiliates, the Employer shall report and pay the benefit contributions to the fringe benefit fund identified, and the contribution rates specified, under that labor agreement. If the work performed is not covered under a labor agreement with the Laborers' International Union of North America or its affiliates, then the Employer shall report and pay the benefit contributions to the fringe benefit funds identified, and the contributions rates specified, under this Agreement. No Employee shall be obligated to accept out of town employment or be subject to retaliation for refusing such work.

Where out of town work requires an overnight stay, the Laborer shall receive paid lodging plus $55 per night for meals and incidental expenses of the equivalent in accordance with an Employer's policy. Nothing herein shall restrict an Employer's ability to require compliance with its applicable travel related policies. This provision will take effect only for projects bid on or after June 1, 2021.

**Paragraph 14. SPECIAL RULES FOR BONDING.** An Employer that is owned or managed, in whole or part, by an individual who currently has or previously had in the last ten (10) years ownership or principal managerial responsibility for another contributing Employer that currently is or ceased doing business when delinquent to the Funds shall be required to post for the benefit of the Funds an additional cash bond or obtain a surety bond

34

from a Fund-approved insurer in an amount equal to twice the amount of the other contributing Employer's delinquency. This amount may be adjusted by the Benefit Fund Trustees for each individual Employer. This bond shall be in addition to and separate from the bond required elsewhere in this Agreement.

**Paragraph 15. WITHDRAWAL OF EMPLOYEES.** If the Employees are withdrawn from any job in order to collect contributions to the Laborers' Health and Welfare, Pension and/or Apprenticeship and Training Funds, the Employees who are affected by such stoppage of work shall be paid for lost time up to sixteen (16) hours, provided that two (2) days' written notice of intention to remove Employees from the job is given to the Employer by the Union. These lost time amounts may be collected only from the contractor with whom the Union has a dispute and the Union shall not pursue collection efforts from any other entity. This lost time liability shall not apply if the Employer has made payment on behalf of the affected Employees to another fringe benefit fund under a MARBA labor agreement or a labor agreement of a union affiliated with the Building and Construction Trades Department, AFL-CIO.

### Article VI
### BONDING TO GUARANTEE WAGE PAYMENTS AND WELFARE AND PENSION CONTRIBUTIONS

**Paragraph 1.** All Employers shall procure, carry and maintain a surety bond in form and amount satisfactory to the Union, but not less than in the principal sum of $5,000.00, to guarantee payment of wages, Pension and Welfare Trust contributions, during the term of this Agreement.

**Paragraph 2.** If the Employer employs between seven (7) and ten (10) Laborers the surety bond shall be increased to $15,000. If the Employer employs between eleven (11) and twenty (20) Laborers, the surety bond shall be increased to $25,000. If the Employer employs

35

twenty-one (21) to forty (40) Laborers, the surety bond shall be increased to \$35,000. If the Employer employs forty-one (41) or more Laborers, the surety bond shall be increased to \$45,000. The trustees of the benefit funds, based on established guidelines or a contractor's payment history, shall have the discretion to adopt a policy that increases, reduces or eliminates the bonding requirements of this Article for those contractors the trustees deem appropriate for such increase, reduction or elimination.

**Paragraph 3.** The Employer shall be required to obtain an appropriate bond upon execution of this Agreement, which bond may also be posted in cash. Should the Employer fail to comply with the provisions of this Article, the Union may withdraw its Employees or strike until such compliance occurs, and the Employer shall further be liable for all costs, including attorney's fees, incurred in enforcing these provisions.

**Paragraph 4.** The Employer shall give notice to the Union and the appropriate Fund Office in writing not later than ten (10) days after the occurrence of any of the following events relating to the Employer, occurring after the date hereof:

(a) Formation of Partnerships;
(b) Termination of business;
(c) Change of name commonly used in business operation;
(d) Change in form of business organization;
(e) Incorporation of business;
(f) Dissolution of corporation;
(g) Name and business organization of successor;
(h) Admission to or withdrawal from any association operating as a multi-employer bargaining agent.

**Paragraph 5. WITHDRAWAL OF EMPLOYEES.** If the Employees are withdrawn from any job in order to ensure compliance with the provisions of this Article, the Employees who are affected by such stoppage of work

36

shall be paid for lost time up to sixteen (16) hours, provided that two (2) days' written notice of intention to remove Employees from the job is given to the Employer by the Union. These lost time amounts may be collected only from the contractor with whom the Union has a dispute and the Union shall not pursue collection efforts from any other entity. This lost time liability shall not apply if the Employer produces the required bond before expiration of the two-day notice period.

## Article VII
### INDUSTRY FUNDS

**Paragraph 1.** Each Employer shall pay into the MID-AMERICA REGIONAL BARGAINING ASSOCIATION INDUSTRY ADVANCEMENT FUND (hereinafter sometimes referred to as the "Industry Fund"), or such other fund as MARBA may in its sole discretion designate at any time during the term of this Agreement, the amount of six cents ($0.06) for each hour worked for the Employer by those of his Employees who are covered by this Agreement.

Each Employer shall pay into the Chicago-Area Laborers-Employers Cooperation and Education Trust ("LECET"), the amount of seven cents ($0.07) for each hour worked for the Employer by those of his Employees who are covered by this Agreement.

Each Employer shall pay into the Laborers' District Council Labor-Management Cooperation Committee ("LDC/LMCC"), the amount of seventeen cents ($0.17) for each hour worked for the Employer by those of his Employees who are covered by this Agreement.

Each Employer shall contribute one cent ($0.01) per hour for each hour worked by his/her Employees who are covered by this Agreement to the Construction Industry Service Corporation ("CISCO"), a not for profit corporation.

**Paragraph 2.** The Employer agrees to be bound by the Agreement and Declaration of Trust establishing the Industry Fund, as well as any amendments thereto, and

37

agrees to be bound by all actions taken by the Trustees of said Industry Fund pursuant to said Agreement and Declaration of Trust and amendments thereto. The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the LECET and LDC/LMCC, as well as any amendments thereto.

**Paragraph 3.** Inasmuch as the existence and utilization of these Industry Fund(s) should result in increased construction and, therefore, in increased construction job opportunities for Employees, the Union agrees to cooperate in assuring that the contributions required by this Article are in fact made by Employers bound by this Agreement.

**Paragraph 4.** For the period June 1, 2021 to May 31, 2026, each Employer shall contribute one cent ($0.01) per hour for each hour worked by its Employees who are covered by this Agreement to the Chicagoland Construction Safety Council, a not for profit corporation.

### Article VIII
### WORK HOURS - OVERTIME -
### HOLIDAYS ELECTION DAYS

**HOURS**

**Paragraph 1.** Eight (8) hours shall constitute a regular workday, from Monday through Friday.

**Paragraph 2.** Forty (40) hours shall constitute a regular workweek, from Monday through Friday.

**Paragraph 3.** The Employer will abide by all overtime requirements below.

**Paragraph 4.** An employee required to work through his or her eating period shall nevertheless work for at least 8.5 hours (inclusive of one half hour paid at time and one half).

**OVERTIME**

**Paragraph 1.** Time and one-half (1½)) shall be paid for all time worked up to four (4) hours in excess of eight (8) hours in any one regular workday.

38

**Paragraph 2.** Double time shall be paid for all time worked in excess of twelve (12) hours in any one regular workday.

**Paragraph 3.** Time and one-half shall be paid for all time worked in excess of forty (40) hours in any work-week.

**Paragraph 4.** Time and one-half shall be paid for any work done on Saturdays for the first ten (10) hours regardless of the number of hours worked in the regular workweek; and double time shall be paid for all time worked over ten (10) hours.

**Paragraph 5.** Unless the Employer is delinquent in the payment of fringe benefit fund contributions or working dues, has failed to comply with a JGC or arbitration award, or is in violation of JATC rules, in weeks that have designated holidays, but not more often than six (6) times per year, the Employer may schedule four (4) consecutive ten (10) hour work days at straight time. The four (4) ten-hour workdays can be nonconsecutive if the other trades working alongside the Laborers are working the same schedule. In order to use this alternate work schedule, the Union and the Employees must have notice no later than four o'clock pm on the preceding Friday. The notice to the Union shall be through the District Council web portal.

**HOLIDAYS**

The following days shall be considered Holidays and shall be paid at double time rates: All Sun- days, New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, Christmas Day. All Sunday and Holiday work shall be cut to a minimum and shall be resorted to only protect life and property. When a Holiday falls on Monday through Friday, make-up day on Saturday shall be paid at time and one-half for the first ten (10) hours and double time thereafter. If a holiday falls on a Sunday, it shall be celebrated on the following Monday. If a holiday falls on a day other than Sunday, it shall be celebrated on that date.

**ELECTION DAYS**

**Paragraph 1.** On Election Days, the individual Employee in this trade shall be allowed not more than two (2) hours from the job without pay for the purpose of voting.

**Paragraph 2.** The time allowed shall be at the Employer's discretion so as not to interfere with scheduled work, except where such discretion is in conflict with State or Federal laws.

### Article IX
### SHIFT WORK

**Paragraph 1.** No Employee shall work more than one shift of eight (8) hours in twenty-four (24), except as herein provided.

**Paragraph 2.** Eight (8) hours shall constitute a night's work which under normal, usual and ordinary conditions and circumstances shall commence at 4:00 P.M. when two gangs are employed. Where three gangs are employed, one shift will follow the other, and in order that work may be continuous, the shifts shall begin at 8:00 A.M.; 4:00 P.M.; and 12:00 o'clock midnight.

**Paragraph 3.** Under other conditions and circumstances, starting time of eight (8) hour shifts shall be optional with the Employer, provided said Employer notifies the Employee of such starting time.

**Paragraph 4.** When three eight (8) hour shifts or two twelve (12) hour shifts are worked, one (1) eating period of one-half hour during each shift shall be allowed without a deduction of pay. Where one or two eight (8) hour shifts are worked, the eating-period pay will not apply. Employees shall receive eight (8) hours' pay under this Section even if they are permitted to leave after seven and one-half (7½)) hours, and it shall be a violation of this Agreement if an Employee does not receive eight (8) hours' pay. Employees who work eight (8) hours on a shift without receiving one-half hour lunch shall receive,

in addition to the eight (8) hours' pay as provided in this Section, one (1) hours' pay at the applicable premium rate.

When it is necessary that the contractor use more than one shift for a period of three (3) or more consecutive days, the Union shall be notified twenty-four (24) hours in advance of the effective date of the starting of such multiple shift operations.

**Paragraph 5. SHIFT DIFFERENTIAL.** Where a second eight (8) hour shift is established, Employees working on the second shift shall receive fifty cents ($0.50) per hour in addition to their base rate of pay. Where a third shift is established, or where a second twelve (12) hour shift is established, Employees working on such shifts shall receive one dollar ($1.00) per hour in addition to their base rate of pay.

### Article X
### WORK RULES AND CONDITIONS

**Paragraph 1. REPORTING TIME PAY.** a) After a person has been hired and ordered to report for work at the regular starting time and no work is provided for him on the day he has so reported, he shall receive four (4) hours' pay at the rate applicable for that day, weather conditions, fire, accident or other unavoidable cause, beyond the Employer's control excepted: however, when an Employee is directed to wait before starting work during inclement weather by the Employer, his Superintendent or Foreman, and said Employee is not notified within thirty (30) minutes that no work will be done because of such conditions, the Employee shall receive two (2) hours' pay; further, if Employees perform any work and then are prevented from completing a day's work because of inclement weather, they shall receive a minimum of four (4) hours pay; but if they work over four (4) hours, they shall be paid for eight (8) hours.

b) **WORK DAY.** Once a work day has been established (starting time) it shall not be changed unless agreed

41

upon by the Employer and the Union. (With the exception of emergencies.)

c) When notification that work shall not be performed on a particular day, notification of such fact to the Steward shall constitute notice to the men, provided such notification is made during working hours and the Steward is afforded a reasonable opportunity to notify the men.

**Paragraph 2.** When an Employee is discharged or laid off, the Employer shall pay all wages due him on the day of discharge or layoff. Wages due, at the option of the Employer, may be paid in person or placed in the mail that same day.

**Paragraph 3.** An Employee quitting of his own accord shall be paid on the next regular pay day.

**Paragraph 4.** At the discretion of the Employer or his Foreman, all small tasks customarily performed by Employees covered by this Agreement may be done by others, if:

a) Such Employees are not on the job;

b) The tasks to be performed and can be done in not more than one-half hour in any one day.

**Paragraph 5. SAFETY AND SANITATION.** Fresh drinking water and suitable shelters for the changing of work clothes shall be provided by the Employer on the job site. In inclement weather, heated shelters shall be provided for such purpose, and all work of the Employee shall be performed under mutually agreed safety and sanitary conditions in conformity with Federal, State and Municipal regulations in effect. The Employer also agrees that it will ice the water at the start of each shift.

**Paragraph 6. TOOLS AND EQUIPMENT.** There shall be no restrictions of the use of any type of machinery, tools or labor-saving devices. Tools, boots, hard hats, rain gear, implements and safety equipment shall be furnished by the Employer and the same shall remain the property of the Employer. Hard hats and safety equip-

42

ment shall be maintained and worn at all times as direct-
ed by the Employer, or at any time the task at hand may
be hazardous to the Employee.

**Paragraph 7. WORKER'S COMPENSATION.** The
Employer agrees to provide security for the payment of
compensation to Employees injured, in accordance with
the provisions of the Illinois Worker's Compensation Act.
The Employer shall, upon request of the Union, submit a
certificate of compliance evidencing same.

**Paragraph 8. NON-DISCRIMINATION.** The Em-
ployer agrees that there shall be no discrimination against
any Employee who may be an officer, steward or member
of the Union serving on any committee authorized by the
Union.

The masculine gender has been used in this Agree-
ment to facilitate ease of writing and editing and therefore
the masculine gender shall include the feminine gender.
Whenever the words "he", "him", "his", or "man" is
used, they shall be read and construed as "he or she",
"him or her", "his or hers", and "man or woman",
respectively.

**Paragraph 9. RIGHTS OF PARTIES.**

a) Business Representatives of the Union shall be
allowed to visit all jobs during working hours to inter-
view the Steward or men working on the job.

b) In all tunnel work, the Union shall be recognized
as the sole Local of the Laborers' International Union of
North America to perform the work classified in Article
II of this Agreement.

**Paragraph 10. PAYMENT DISPUTES.** Notwith-
standing this Agreement of the parties that, in principle,
disputes should never cause work stoppages, the parties
consider an Employer's default in payment of wages, and
contributions to the Health and Welfare and Pension
Funds to be grounds for an exception to this principle,
and provisions for enforcement of it hereafter made; and
the Union is, therefore, expressly authorized to cause the

43

Employees to stop work immediately on any job on which wages admittedly owed are not paid promptly when due. The authorization to cause immediate work stoppage shall not extend to any case where a dispute in good faith exists between the Employer, Employee or Employees as to the amount due. The Employer agrees that no punitive action shall be taken against their Employees, if said Employees refuse to cross a picket line that may be placed on the job or project of their Employer.

**Paragraph 11. LIQUIDATED DAMAGES.** Payment by the Employer and acceptance by the Employee of less than wage herein stipulated shall be a violation of this Agreement upon the part of each. Upon conclusive proof to the Joint Grievance Committee of such violation, the Employer shall immediately pay the unpaid balance due in accordance with the wage herein stipulated; and in addition thereto, shall pay as directed by the Joint Grievance Committee an amount no less than the fifty percent (50%) of the amount of such pay shortage as just and liquidated damages because of such violation. In cases where an Employee was knowingly complicit in the underpayment of wages, none of the liquidated damages assessed against the Employer shall be awarded to that Employee.

**Paragraph 12. KEY MAN.** The Employer may utilize no more than one (1) Laborer at a job site as its key man who resides outside the geographic area covered by this Agreement. This limitation shall not apply to any Laborer who works regularly and continuously within the geographic area covered by this Agreement. Exceptions can be made with the parties' mutual agreement in order to obtain reciprocal arrangements with other jurisdictions.

**Paragraph 13. ACCESS TO PREMISES.** Authorized representatives of the Union shall have access to all construction projects, provided that they first notify the Employer of their arrival, that they do not stop the progress of the project (except to the extent as may be authorized in this Agreement), and provided further that

such representatives fully comply with the visitor and security rules established for the construction project by the general contractor and the owner. It shall be the duty of the Employer to provide adequate passes, as requested by the Union, provided the Employer is able to do so.

**Paragraph 14. Public Health Emergencies.** In any county or portion thereof covered by this Agreement, if the Illinois Governor declares a public health emergency, and for the duration thereof, the Employer shall abide by recommendations from the Centers for Disease Control (CDC) and the Illinois Department of Public Health (IDPH), and all applicable laws and regulations, for construction worker health and safety. If the Employer fails to timely comply with such requirements after notice from and discussion with the Union (including the District Council if requested), the Union may withdraw employees from any worksite not in compliance herewith.

## Article XI
## STEWARDS

**Paragraph 1.** The parties agree that the following basic principles apply to the selection of a Job Steward:

1) The Union requires that a Steward must fully protect the interest of the Union.

2) The Employer requires that the Steward be a Laborer who can efficiently perform his duties as a Laborer and will not disrupt the job unnecessarily in discharging his duties as a Steward.

3) To meet the two basic principles agreed to by the parties, it is further agreed:

a) The Job Steward shall be a working Laborer;

b) The Steward shall be selected by the Business Manager of the Union with jurisdiction over the job;

c) In selecting a Steward, preference shall be given to the Union members presently employed in the bargaining unit of the Employer on the specific site, provided, how-

ever, that if, in the judgment of the Business Manager, no presently employed Union member is competent to act as Steward, the Steward shall be selected from outside the bargaining unit. A reason shall be given by the Business Manager why no member is competent. However, the reason shall not infringe upon the right of the Business Manager to select the Steward; and

d) The Union shall have the right to replace any Steward at any time.

The Steward shall be subject to the same terms of employment as any other Employee and said Steward shall not be discriminated against for so acting, and, if qualified, shall remain employed on the job as long as there are other members of the Union employed by the Steward's employer to work on the said job. He shall, however, be subject to removal for cause.

**Paragraph 2**. Among other duties, one of the duties of the Steward shall be to see to it that every Employee is in compliance with Article III of this Agreement when applicable; Employees shall report to the Stewards any differences or disputes which may arise in connection with the work or any part of it, and the Steward shall report same to the office of the Union.

### Article XII
### FOREMEN - SUB-FOREMEN

When fewer than five (5) Laborers are employed, then, if in the judgment of the Employer, a Labor Foreman is required upon the work, such Foreman shall be selected by the Employer among the employed Laborers. However, when more than five (5) but less than ten (10) Laborers are employed, the Employer shall be required to select a Laborer as a Labor Foreman. Where more than ten (10) Laborers are employed, the Employer shall be required to select a Laborer as a Sub-Foreman for the first ten (10) Laborers employed thereafter. When a Labor Foreman is in charge of five (5) or more Laborers, his duties will be confined to supervision.

## Article XIII
## TRAINING AND
## APPRENTICE PROGRAM

**Paragraph 1. APPRENTICE COMMITTEE.** MARBA and the Union shall create a Joint Apprenticeship Training Committee (JATC), consisting of three (3) management and three (3) Union appointees to draft a trust agreement, hire staff, develop apprenticeship standards and oversee implementation of the apprentice program. The Employer hereby adopts and shall be bound by the agreement and declaration of trust established by the JATC for the apprentice program, together with any amendments thereto, which are incorporated by reference herein. The JATC shall have authority to set and enforce penalties for violations of the apprenticeship rules.

**Paragraph 2. APPRENTICESHIP AND TRAINING FUND.** The Employer shall contribute ninety cents ($0.90) per hour for each hour worked from June 1, 2021 to May 31, 2022 for all Employees who are covered under this Agreement to the Construction and General Laborers' District Council of Chicago and Vicinity Apprenticeship and Training Fund payable to the Training Fund or a designated appointee at the end of each month and such additional sums as the Union may designate in its sole discretion from its total economic package on June 1, 2022, June 1, 2023, June 1, 2024 and June 1, 2025 under this Agreement. The terms of the trust establishing the Fund are incorporated by reference herein and all terms regarding auditing, assessment, non-payments and grace periods as set out in the Collective Bargaining Agreement regarding payment of Welfare and Pension Fund contributions shall apply as if fully set forth herein for the Construction and General Laborers' District Council of Chicago and Vicinity Apprenticeship and Training Fund.

**Paragraph 3.** The term of apprenticeship shall be 2,400 hours, or two years, whichever occurs later, or such other duration as is mutually agreed by the Training and

47

Apprenticeship Fund trustees. All Health and Welfare, Pension, Training Fund, Industry Advancement and other contributions required under this Agreement will commence immediately upon employment of an apprentice. Union affiliation will be required after seven (7) days of employment.

**Paragraph 4.** The wages per hour paid to apprentices shall be as follows:

| | |
|---|---|
| 1st six (6) months: | 60% of journeyman (base) wages |
| 2nd six (6) months: | 70% of journeyman (base) wages |
| 3rd six (6) months: | 80% of journeyman (base) wages |
| 4th six (6) months: | 90% of journeyman (base) wages |
| After twenty-four (24) months: | 100% of journeyman (base) wages |

**Paragraph 5.** The ratio of journeymen to Apprentices shall be six (6) Laborer journeymen to one (1) Laborer apprentice on a company-wide basis, with no more than twenty percent (20%) of Laborers being apprentices on any one job site of the Employer. Employers who employ a maximum of between one (1) and five (5) Laborer journeymen shall be entitled to one (1) Laborer apprentice, who may be assigned to jobsites irrespective of the twenty percent (20%) job site maximum specified in this provision.

**Paragraph 6.** Referral of apprentices will be through the Local Union with jurisdiction over the job site. Employers requesting apprentices will be assigned an apprentice by the JATC from the available apprentice pool. The JATC can limit the number of apprentices to that which is adequate for current needs and which can be properly trained by the program. Employers may recall their laid off apprentices to work, provided that the Employer complies with the ratios set forth in Paragraph 5. All apprentices must report their hours weekly to the JATC. All apprentices will be required to undergo testing by the JATC for the presence of illegal substances at the time they enter the apprentice program.

48

**Paragraph 7. MANDATORY APPRENTICESHIP.**
Under the terms described below, all inexperienced
Laborers employed under this Agreement shall enter the
trade as apprentices. The Joint Apprenticeship Training
Committee shall establish the rules and procedures to
implement this mandate no later than January 1, 2019.

The mandatory apprenticeship terms shall include
the following:

1. Employers shall be allowed to employ the indi-
viduals of their choice for apprenticeship, up to
the maximum ratios in the Agreement, provided
those individuals fulfill the conditions and
requirements of the apprentice program. No
Employer shall be refused sponsorship of an eli-
gible apprenticeship applicant due to lack of
openings in the apprenticeship program. There
shall be no limit to the number of apprentices an
employer can sponsor provided however that the
employer shall not exceed the employment of
apprentice ratios contained in the Agreement.

2. Other terms of employment for apprentices shall
be as set forth in this Article unless otherwise
agreed by the JATC.

### Article XIV
### SETTLEMENT OF DISPUTES

**Paragraph 1.** Any dispute concerning the interpreta-
tion or application of this Agreement between an
Employer and the Union shall be adjusted by the particu-
lar Employer and Union, in the first instance.
Jurisdictional disputes (that is, competing claims for the
assignment of work) are not subject to being processed
through this grievance procedure.

**Paragraph 2.** In the event that the matter is not set-
tled, the Union may file a written grievance, which shall
be submitted to a Joint Grievance Committee (hereinafter
the "JGC") comprised of three (3) Employer representa-
tives selected by MARBA and three (3) Union representa-

tives selected by the Construction and General Laborers' District Council of Chicago and Vicinity, which shall convene monthly. The JGC shall adopt its own rules of procedure. The Union must file the grievance within forty-five (45) days of the date of the occurrence giving rise to the grievance or when the affected Employee knew or reasonably should have known of the existence of the grievance. Grievances not filed within the forty-five (45) day period are deemed waived and are not subject to being processed through this procedure. The determination of the JGC shall be governed by majority vote, provided that the Employer representatives and Union representatives shall have equal voting power. If decided by majority vote, the grievance determination and any relief determined to be appropriate shall be final and binding upon all parties.

Laborers who prevail in their grievances shall be compensated for two (2) hours lost time to attend the JGC Grievance hearing. Grievances shall be dismissed if the grievant fails to appear at the scheduled hearing and no continuance is granted by the JGC.

**Paragraph 3.** In the event that the JGC is deadlocked upon the disposition of a grievance, then the Union or the Employer may refer the matter to arbitration by so notifying the other within thirty (30) days of the date of the JGC decision. The moving party shall obtain a list of seven (7) arbitrators from the Federal Mediation and Conciliation Service, provided that all arbitrators maintain their principal office in the Chicago area. The party selected by lot shall strike the first name from the list, then parties shall alternately strike names from the list until one arbitrator remains.

Grievances alleging a violation of Fundamental Principle No. 8 of this Agreement shall be initiated with the designated company official and may be processed under the grievance procedure contained herein or advanced directly to arbitration at the discretion of the Union. Such grievances shall be subject to the same forty-

five (45) day time limitation as provided under this Article. In the event the Union elects to proceed directly to arbitration over a grievance concerning a violation of Fundamental Principle No. 8 of this Agreement said grievance must be referred to an arbitrator within thirty (30) days from the date of filing. The parties to the grievance may agree to extend the time in which the grievance is to be referred to an arbitrator by written mutual agreement. If the Union does not timely elect to proceed directly to arbitration of the grievance, the grievance shall be heard by the JGC and the process set forth in paragraphs 2 and 3 above shall apply.

**Paragraph 4.** The decision of the arbitrator shall be final and binding upon all parties. The arbitrator shall not be empowered to amend, alter or add to this Agreement. The arbitrator's expenses shall be jointly paid by the Employer and the Local Union between whom the grievance exists.

**Paragraph 5.** Any party who fails to comply with an award within seven (7) days' notice of an arbitrator's award or the JGC determination shall be responsible for an additional ten percent (10%) liquidated damages on any monetary award and all court costs and reasonable attorney fees actually incurred by the party enforcing the award.

**Paragraph 6.** With regard to this Article, the Union reserves its right, and it shall not be a violation of this Agreement, for the Union to strike, picket and/or withdraw its Employees from any Employer who fails to pay wages or fringe benefits as required under this Agreement. Except as provided in this Article, there shall be no strike, slowdown, withdrawal of men or other concerted refusal to work by the Union or the Employees during the term of this Agreement. Further, there shall be no lockout by the Employer. The Employer further agrees that no punitive action shall be taken against its Employees if said Employees refuse to cross a picket line that may be placed on the job or project of their Employer.

**Paragraph 7. WAGE AUDITS.** Where the grievance concerns wages that are reflected in a wage audit showing a pattern or practice of wage underpayment, the grievance must be filed within forty-five (45) days after the Union's receipt of the audit. The recovery of any wages shall be limited to the two-year period preceding the grievance filing date (or three (3) years if so determined for cause by the Joint Grievance Committee). In cases where an Employee was knowingly complicit in the underpayment of wages, that Employee shall be limited to receiving unpaid wages from the last forty-five (45) days and the additional amounts assessed against the Employer shall first be paid to defray the audit costs and thereafter as directed by the Joint Grievance Committee.

## Article XV
### ALCOHOL AND SUBSTANCE ABUSE

The parties incorporate the CISCO Uniform Drug-/Alcohol Abuse Program, as modified, attached hereto as Addendum.

It is recognized that some client owners require additional substance abuse procedures to be followed on their projects for all trades, and it shall not be a violation of this agreement for signatory Employers to comply with such procedures, provided prior written notification is given to the District Council.

## Article XVI
### APPROVAL

**Paragraph 1. EMPLOYER'S WARRANTY.** The Underground Contractors Association and its bargaining association represent and warrant that they are the bargaining agents of all the individual Employers of the Underground Contractors Association who are now or hereafter become members of said Underground Contractors Association and who assign to the Association full authority to negotiate and execute this Agreement.

52

**Paragraph 2. EXECUTION.** It is expressly agreed and understood that execution of this Agreement by authorized representatives of the Underground Contractors Association shall be conclusively presumed sufficient legal execution by all individual contractors represented by said Association and that individual executions are not required for this Agreement to be binding on such Contractors.

**Paragraph 3. SAVINGS CLAUSE.** Any provision contained herein which is contrary to or held to be in violation of any State or Federal Law shall be void and of no force or effect, and this Contract shall be construed as though such void provision were not a part hereof, it being intended that the other provisions of this Contract shall not be affected thereby.

**CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY**


By: James P. Connolly, Business Manager


By: Charles V. LoVerde III, Secretary-Treasurer

**UNDERGROUND CONTRACTORS ASSOCIATION
BY THE MID-AMERICA REGIONAL BARGAINING
ASSOCIATION**


By: Seth Gudeman, Chairman

53

**ADDENDUM**

### CONSTRUCTION INDUSTRY SERVICE CORPORATION JOINT LABOR-MANAGEMENT UNIFORM DRUG/ALCOHOL ABUSE PROGRAM

#### I. Policy Statement

The parties recognize the problems created by drug and alcohol abuse and the need to develop prevention and treatment programs. (Company Name), and the signatory unions seek to protect people and property, and to provide a safe working environment. The purpose of the following program is to establish and maintain a drug free, alcohol free, safe, health work environment for all of its Employees.

#### II. Definitions

a. **Company Premises** - The term "Company Premises" as used in this policy includes all property, facilities, land, buildings, structures, automobiles, trucks and other vehicles owned, leased or used by the company. Construction job sites for which the company has responsibility are included.

b. **Prohibited Items & Substances** - Prohibited substances include illegal drugs (including controlled substances, look alike drugs and designer drugs), alcohol beverages, and drug paraphernalia in the possession of or being used by an Employee on the job.

c. **Employee** - Individuals, who perform work for (Company Name), including, but not limited to, management, supervision, engineering, craft workers and clerical personnel.

d. **Accident** - Any event resulting in injury to a person or property to which an Employee, or contractor/contractor's Employee, contributed as a direct or indirect cause.

e. **Incident** - An event which has all the attributes of an accident, except that no harm was caused to person or property.

54

    f. **Reasonable Cause** - Reasonable cause shall be defined as excessive tardiness, excessive absenteeism, and erratic behavior such as noticeable imbalance, incoherence, and disorientation.

## III. Confidentiality

    a. All parties to this policy and program have only the interest of Employees in mind, therefore, encourage any Employee with a substance abuse problem to come forward and voluntarily accept our assistance in dealing with the illness. An Employee assistance program will provide guidance and direction for you during your recovery period. If you volunteer for help, the company will make every reasonable effort to return you to work upon your recovery. The company will also take action to assure that your illness is handled in a confidential manner.

    b. All actions taken under this policy and program will be confidential and disclosed only to those with a "need to know".

    c. When a test is required, the specimen will be identified by a code number, not by name, to insure confidentiality of the donor. Each specimen container will be properly labeled and made tamper proof. The donor must witness this procedure.

    d. Unless an initial positive result is confirmed as positive, it shall be deemed negative and reported by the laboratory as such.

    e. The handling and transportation of such specimen will be properly documented through the strict chain of custody procedures.

## IV. Rules - Disciplinary Actions - Grievance Procedures

    **1. Rules** - All Employees must report to work in a physical condition that will enable them to perform their jobs in a save and efficient manner. Employees shall not:

    a. Use, possess, dispense or receive prohibited substances on or at the job site; or

    b. report to work with any measurable amount of prohibited substances in their systems.

2. **Discipline** - When the company has reasonable cause to believe an Employee is under the influence of a prohibited substance, for reasons of safety, the Employee may be suspended until test results are available. If no test results are received after three (3) working days, the Employee, if available, shall be returned to work with back pay. If the test results prove negative, the Employee shall be reinstated with back pay. In all other cases:

    a. Applicants testing positive for drug use will not be hired.

    b. Employees who have not voluntarily come forward, and who test positive for drug use, will be terminated.

    c. Employees who refuse to cooperate with testing procedures will be terminated.

    d. Employees found in possession of drugs or drug paraphernalia will be terminated.

    e. Employees found selling or distributing drugs will be terminated.

    f. Employees found under the influence of alcohol while on duty, or while operating a company vehicle, will be subject to termination.

3. **Prescription Drugs** - Employees using prescription medication which may impair the performance of job duties, either mental or motor functions, must immediately inform their supervisors of such prescription drug use. For the safety of all Employees, the company will consult with you and your physician to determine if a re-assignment of duties is necessary. The company will attempt to accommodate your needs by making any appropriate re-assignment. However, if a re-assignment is not possible, you will be placed on temporary medical leave until released as fit for duty by a prescribed physician.

4. **Grievance** - All aspects of this policy and program shall be subject to the grievance procedure contained in the applicable collective bargaining agreement.

## V. Drug/Alcohol Testing

The parties to this policy and program agree that under certain circumstances, the company will find it necessary to conduct drug and alcohol testing. While "random" testing is not necessary for the proper operations of this policy and program, it may be necessary to require testing under the following conditions:

a. A pre-employment drug and alcohol test may be administered to all applicants for employment. Employees recalled to work by an Employer, and Employees referred to an Employer by the Union who are requested to be tested, shall be compensated at their regular hourly rate of pay for the time required in such testing;

b. A test may be administered in the event a supervisor has a reasonable cause to believe that the Employee has reported to work under the influence, or is or has been under the influence while on the job; or has violated this drug policy. During the process of establishing reasonable cause for testing, the Employee has the right to request his on- site representative to be present;

c. Testing may be required if an Employee is involved in a workplace accident/incident or if there is a workplace injury;

d. Testing may be required as part of a follow-up to counseling or rehabilitation for substance abuse, for up to a one (1) year period.

Each Employee will be required to sign a consent and chain of custody form, assuring proper documentation and accuracy. If an Employee refuses to sign a consent form authorizing the test, ongoing employment by the company will be terminated.

Drug testing will be conducted by an independent accredited laboratory (National Institute on Drug Abuse

and/or College of American Pathology), and may consist of either blood or urine tests, or both as required. Blood tests will be utilized for post accident investigation only.

The company will bear the costs of all testing procedures.

### VI. Rehabilitation and Employee Assistance Program

Employees are encouraged to seek help for a drug or alcohol problem before it deteriorates into a disciplinary matter. If an Employee voluntarily notifies supervision that he or she may have a substance abuse problem, the company will assist in locating a suitable Employee assistance program for treatment, and will counsel the Employee regarding medical benefits available under the company or Union health and welfare/insurance program.

If treatment necessitates time away from work, the company shall provide for the Employee an unpaid leave of absence for purposes of participation in an agreed upon treatment program. An Employee who successfully completes a rehabilitation program shall be reinstated to his/her former employment status, if work for which he/she is qualified exists.

Employees returning to work after successfully completing the rehabilitation program will be subject to drug tests without prior notice for a period of one year. A positive test will then result in disciplinary action as previously outlined in this policy and program.

## WORK RULES COMMITTEE

The Union and MARBA together shall create a Work Rules Committee consisting of an equal number of members representing each party with no more than three (3) persons from each. Alternate members may be appointed. The purpose of this Committee shall be to consider, discuss, and propose, under appropriate circumstances, Work Rule changes to the Agreements.

No discussions by or meetings of the Committee shall be considered to be a reopening of the Agreements. At all times, the no-strike and no-lockout provisions of the Agreements shall remain in full force and effect.

Any Work Rule changes proposed by the Committee must be ratified by the Union and MARBA.

**CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY**

By: James P. Connolly, Business Manager

By: Charles V. LoVerde III, Secretary-Treasurer

**UNDERGROUND CONTRACTORS ASSOCIATION
BY THE MID-AMERICA REGIONAL BARGAINING
ASSOCIATION**

By: Seth Gudeman, Chairman

## Side Letter #1

Understanding the importance of verifying the prevailing wage under Illinois law and under the Davis-Bacon Act, the parties have agreed to meet during the contract term to develop a mutually agreeable procedure to provide information necessary to the Illinois Department of Labor to confirm the prevailing wage rate for work performed in the counties covered by their labor agreements.

## Side Letter #2

This serves to confirm our discussions during the 2017 labor negotiations concerning Union proposal No. 4, accepted by MARBA, which provides as follows: *"Revise language to state "each hour worked by all Employees who are covered by this Agreement....."*

As we discussed, the intent of the proposal is to better enable the fringe benefit funds to seek contributions from those employers who may split hours worked by employees covered by the MARBA agreements; and further, that the intent is not to change which employees are covered by the Agreement. The parties also agreed that the language is not intended to permit employers to "buy" benefits for certain workers by having employees, otherwise not covered by the labor agreements, perform Laborers' work on an insignificant basis.

To that end, the parties agreed that the Trustees of the fringe benefit funds will formulate a policy that encapsulates the aforementioned intent of the agreed upon language.

# RESTATED AGREEMENT

## AND

# DECLARATION OF TRUST

### CREATING

# LABORERS' PENSION FUND

With Amendments Through
May 31, 2002

EXHIBIT A3

(b)    To enforce the provisions of the Pension Plan and the rules and regulations adopted by the Trustees in a uniform manner with respect to individuals similarly situated.

(c)    To determine questions arising under the Pension Plan or this Agreement, including the power to determine the rights of Employees and their Beneficiaries, and their respective benefits, and to remedy ambiguities, inconsistencies or omissions.

## ARTICLE VII

## FUNDING PENSION PLAN BENEFITS

**Section I.**    **IN GENERAL.**  In order to fund the benefits provided under the Pension Plan, each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees at the times required by that agreement. The rate of contributions shall be determined by the applicable Collective Bargaining Agreement or Participation Agreement, together with any amendments, supplements or modifications thereto. Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be the same as the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union which covers Employees performing similar work. No

Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the provisions of a Collective Bargaining Agreement or Participation Agreement and any such contract or agreement shall be null and void. It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer has entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement. All contributions shall be paid in the manner and form required by the Trustees.

Section 2. DEFAULT IN PAYMENT OF CONTRIBUTIONS. Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity. Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment. The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed. All Employers party to or otherwise bound by this Agreement acknowledge that the

liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10%, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions and any payments owed by an Employer pursuant to an installment agreement, shall bear interest up to the prime rate of interest plus two points charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied. The Trustees are hereby given the power and authority to delegate the collection of contributions to a Collection Committee, which, in its discretion, may assess a lesser or greater amount or waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Fund. The Collection Committee may include trustees of the Laborers' Welfare Fund as members of the Committee.

In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process, including court fees, audit fees, investigative costs, etc. The term "reasonable attorneys' fees" as used herein shall mean all

-26-

attorneys' fees in the amounts for which the Trustees become legally obligated including recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority, in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees, in lieu of any cash deposit, a bond in an amount not less than Five Thousand Dollars ($5,000.00) or in an amount consistent with the terms of the current collective bargaining agreements. In the event an Employer is repeatedly delinquent in its contribution payments to the Pension Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current collective bargaining agreements, in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3. REPORT ON CONTRIBUTIONS AND PRODUCTION OF RECORDS. The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees, on demand, the names of its employees, their social security numbers, the hours worked by each employee, and such

other information as the Trustees may reasonably require in connection with the administration of the Trust and Pension Plan. The Trustees may at any time have an audit made by an independent certified public accountant or its representatives of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures developed and communicated by the Administrator from the beginning of such Employer's participation in the Pension Fund forward unless given written authorization by the Administrator upon request to destroy said record. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

## ARTICLE VIII

## FILING CLAIMS AND REVIEW OF DENIALS OF CLAIM

Section 1.    FILING OF A CLAIM.    Claims for the payment of any benefits provided by the Pension Plan shall be filed, in writing, in accordance with the Rules and Regulations set forth in Article 7 of the Pension Plan.

## ADDENDUM A

## RECORDS REQUIRED TO BE RETAINED BY EMPLOYERS
## AND PRODUCED FOR AUDITS

The following records shall be maintained and retained by all contributing employers to the Benefit Funds for at least six years from the contribution date and shall be produced for inspection and copying by an auditor of the Benefit Funds upon written request:

1. Quarterly and annual payroll tax returns, including, but not limited to, federal quarterly form 941's, federal annual form W-2's, W-3's, 940's, 1099's and state quarterly unemployment returns (form UC-3).

2. Payroll journals and/or registers which include or identify employees' social security numbers, hourly rates of pay, hours worked and the time period in which the work was performed.

3. Individual earnings records for all employees of the employer not shown on payroll journals or registers, including social security number and work classification (or code or clock or ID number), hourly rates of pay, hours worked and the time period in which the work was performed.

4. Cash disbursement journals and general ledgers.

5. Copies of all contribution reports and proof of payment (canceled checks or records of canceled checks) of all contributions to the Laborers' Funds and to all other trade union fringe benefit funds to which the employer contributed.

6. Copies of all dues records and proof of payment (canceled checks or records of canceled checks) of all union dues submitted to the Laborers' District Council.

7. Records showing all amounts paid to all persons or entities that performed work for the employer as independent contractors or subcontractors, if any, including copies of any federal form 1099's issued by the employer.

8. Daily time records filed by employees or supervisors.

9. Source documents and lists of job codes and equipment codes.

10. Certified payrolls for public sector jobs where such payrolls are required.

11. Employee personnel files including, but not limited to, last known addresses and telephone numbers, any documents which demonstrate employees' job classifications and/or status as an apprentice, journeyman, foreman, superintendent, or supervisor. (Confidential medical records or other private records not relevant to the establishment of an employee's job classification shall not be disclosed.)

12. Bank account statements and canceled checks from any account used in conjunction with the employer's business.

13. If records of all hours worked, rates of pay and classifications are not provided in the records listed in items 1 through 10, the employer shall maintain monthly lists of all employees not shown on payroll records, showing Social Security number and work classification (or code or clock or ID number), rates of pay and hours worked.

Honor Roll Employers shall be required only to produce basic records needed by the Benefit Funds' auditors to do an audit, specifically items 1 through 7 above. However, if an initial examination of such limited records discloses significant record keeping errors or failures to contribute, the auditor may request additional records listed above. In the absence of evidence of a deliberate failure by an Honor Roll Employer to contribute on behalf of a bargaining unit employee, the rebuttable presumptions provided for in the attached Policy for Retention and Production of Employer Records shall not apply to such Honor Roll Employer.

Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced. The judgment of the trustees in interpreting and applying this policy shall be conclusive and binding on all parties.

Adopted January 9, 2002

2

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR RETENTION AND PRODUCTION OF EMPLOYER RECORDS

As Adopted by the Boards of Trustees
Effective as of April 1, 2006

WHEREAS, Section 209 of the Employee Retirement Income Security Act of 1974 , as amended ("ERISA"), 29 U.S.C. Section1059, requires employers obligated to contribute to employee benefit funds to maintain records with respect to its employees which are sufficient to determine benefits due to such employees of which may become due to them; and

WHEREAS, the Trustees of the Laborers' Pension Fund and the Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds") have the authority under their respective Trust Agreements to establish rules, regulations and policies regarding records which must be maintained by employers in order to administer the Benefit Funds; and

WHEREAS, the Trustees of the Benefit Funds have found that most contributing employers maintain proper records and make all required contributions to the Benefit Funds, nevertheless, there are employers who are bound by the Trust Agreements of the Benefit Funds who fail to maintain records which are adequate for the Funds to determine whether proper contributions have been made on behalf of eligible employees and that some of such employers do so deliberately in order to avoid their obligations to make such payments; and

WHEREAS, the practices of employers who fail to maintain records sufficient to enable the Benefit Funds to conduct thorough payroll audits cause their employees to lose valuable pension and welfare benefits and cause the Benefit Funds to lose contractually required contributions and investment earnings on those contributions; and

WHEREAS, the practices of employers who fail to maintain adequate records cause the Benefit Funds to incur substantial additional administrative and legal expenses in order to determine proper amounts owed to the Funds by such employers; and

WHEREAS, enforcement of a policy specifying the records required to be maintained and produced increases the ability of the Funds to prove the contributions owed by delinquent employers and thereby to provide proper credit to the employees and their beneficiaries;

NOW THEREFORE, the Trustees resolve that the following policies are adopted by the Benefit Funds effective as of March 1, 2002:

1

1. Except as otherwise provided herein, all contributing employers to the Benefit Funds shall maintain and make available for inspection and copying by an auditor of the Benefit Funds the records listed on Appendix A, attached hereto.

2. Any employer obligated to contribute to the Benefit Funds who fails to maintain and make available for inspection and copying to an auditor of the Benefit Funds the requisite records listed on Appendix A shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union. In those cases where an employer asserts that an employee is excluded because he/she is a member of another bargaining unit, the employer must submit tangible evidence of that fact, e.g., a union membership card, contribution records maintained for the benefit funds of the other bargaining unit, commercial drivers' license if it is asserted that an employee is a truck driver rather than a laborer and workers' compensation policies, forms and applications listing an employee's job classification or other business records. The affidavit of an employer's representative or officer unsupported by documentary evidence shall not be sufficient to meet the employer's burden of proof. Affidavits solicited and obtained ex parte by an employer's representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the employer's burden of proof.

3. When an employer has failed to maintain or make available the requisite records, there shall be a rebuttable presumption that any employee listed as a possible laborer by an auditor, Field Representative or attorney representing the Benefit Funds was a laborer. There shall also be rebuttable presumptions concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid only $10.00 per hour if no record of wage rates was made by the employer, and/or (b) that the employee worked 72 hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied. When evidence exists that a different hourly rate was paid to employees of an employer that failed to maintain the required records, at the discretion of the Director of the Field Department, a different hourly rate may be presumed for purposes of determining the amount of contributions owed by the employer. If that evidence shows that the employer paid a rate lower than $10.00 per hour to any employees doing bargaining unit work, then that lower rate shall be presumed to be the actual rate paid to all employees for whom adequate records were not kept. Similarly, where evidence exists of a different number of hours worked, the Director may apply a different number of hours for determining the contributions owed, and this number of hours worked shall be presumed correct. All wages computed as provided in this paragraph shall be presumed to be paid as straight time wages regardless of the number of hours worked unless the employer has provided documentation, in the form required by the terms of this policy, showing that it followed the requirements of the Fair Labor Standards Act and/or the applicable collective bargaining agreement as to the payment of overtime.

4. An employer that fails to maintain the requisite records and fails to cooperate with the Trustees in establishing the paid wage rates, actual hours of work and contributions owed to the Benefit Funds shall be liable to the Benefit Funds and any related organizations, for the contribution amounts determined as provided herein and also for 20% liquidated damages, compound interest at the rate of prime plus 2 points (as determined by the Administrator), auditor's and attorney's fees and any other expenses of collection including investigative costs.

2

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR SCHEDULING OF AUDITS

### As Adopted by The Boards of Trustees
### Effective as of April 1, 2006

Contributing employers to the Laborers' Pension Fund and the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds"), shall be audited periodically in accordance with the procedures adopted by the Collection Committee of the Benefit Funds. The Director of the Field Department, in cooperation with the Benefit Funds' auditors, shall prepare a schedule for auditing contributing employers in accordance with the following procedures.

Two types of audits shall be conducted: "full audits" in which payroll and other records on all employees are examined and "sampling audits" in which a selection of payroll and other records are tested to enable the compliance auditor to make a reasonable determination that there are no delinquencies. A sampling audit should include a review of all types of records (e.g. payroll records, tax records, cash disbursement records, reports to other benefit funds, etc.) Where a sampling audit discloses delinquencies or related record discrepancies, a full audit shall be conducted.

Employers shall be scheduled for either full audits or sampling audits in groups based upon the contribution histories of the employers. Either a sampling or full audit shall be conducted at least once every five (5) years. Any employer that fails to schedule an audit and submit records for review within 45 days from the date of the audit request will be liable for all costs of compelling and enforcing the audit request. The following procedures shall be used:

## AUDIT PERIOD

1. **New Employers**. New employers shall be scheduled for audits within the first year in which contributions to the Benefit Funds are required.

2. **Honor Roll Employers.** Employers with a history of adequate record keeping and timely, payments to the Benefit Funds ("Honor Roll Employers"), shall be required to submit to audits every three (3) to five (5) years. Following an audit showing adequate record keeping and correct payments, such an employer shall be designated an Honor Roll Employer and shall be selected randomly for an audit between the third and fifth year thereafter. (Such employers may opt for a scheduled audit every three years.) An inadvertent shortage of no more than the greater of $1000 or two percent (2%) of required contributions determined on a full audit covering three or more years of contributions to the Benefit Funds shall not disqualify an employer from inclusion in this group.

3. **Other Contributing Employers**. Employers that are not classified as New or Honor Roll Employers or who have been assessed significant delinquencies to the Benefit Funds or any of the ancillary funds to which contributions are owed pursuant to the collective bargaining agreements of the Laborers' District Council shall be scheduled for full audits at least once every three (3) years.

1

4. **Employers Subject to Special Audits**. At the discretion of the Director of the Field Department full audits of employers obligated to contribute to the Benefit Funds may be conducted at any time based upon information concerning possible delinquencies, e.g., failure to file monthly remittance reports, failure to pay contractually required wage rates, information concerning a possible closing or sale of the business, information that the employer is operating an alter ego or similar bases suggesting possible delinquencies.

## FULL AND SAMPLING AUDITS

1. **New Employers**. If there is a sufficient number of employees of a New Employer, the auditor of the Benefit Funds may do a sampling audit to determine if the employer is maintaining accurate records and making required contributions, otherwise the auditor will do a full audit. An important purpose of audits for new employers is to inform employers of the procedures for contributing to the Benefit Funds and the requisite records to be maintained. *

2. **Honor Roll Employers**. Sampling audits shall be used for Honor Roll Employers if they have sufficient employees to warrant use of sampling methods. If a sampling audit discloses inaccurate or incomplete record keeping or evidence of significant delinquencies, a full audit shall be done.

3. **Other Contributing Employers**. Full audits shall be conducted if employers are not qualified as New or Honor Roll Employers.

4. Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.*


* For information concerning the requisite records to be maintained, see the Laborers' Pension and Welfare Funds Policy for Retention and Production of Employer Records, effective as of April 1, 2006 and the Records Required to be Retained By Employers and Produced for Audits adopted January 9, 2002.

AMENDMENT TO THE
RESTATED AGREEMENT AND DECLARATION OF TRUST
CREATING LABORERS' PENSION FUND

WHEREAS, Article XII of the Restated Agreement and Declaration of Trust ("Trust Agreement") of the Laborer's Pension Fund (the "Fund") provides that the Board of Trustees have the authority to amend the Trust Agreement;

WHEREAS, Article IV of the Fund's Trust Agreement sets forth the powers and duties of the Trustees;

WHEREAS, the Trustees have an obligation to protect the interests of the Plan's Participants and to protect the assets of the Fund;

WHEREAS, the Trustees are aware of situations in which contributing Employers have ceased business operations leaving a large indebtedness to the Fund without a reasonable likelihood of the Fund collecting such delinquent contributions;

WHEREAS, the individual officers and owners of some Employers have secured jobs knowing that they will not comply with their legal obligations to the Fund by keeping accurate records of their laborer employees' employment and make all the required contributions to the Fund; and

WHEREAS, such illegal conduct causes substantial losses to the Fund and deprives Employers who comply with its obligations to the Fund of opportunities to secure employment for their laborer employees; and

WHEREAS, the individual officers, partners or owners of some contributing Employers have used various entities to avoid liability to the Fund for contributions that would otherwise be due and then created new companies in order to continue to operate using such illegal practices;

WHEREAS, in some instances such individual officers or owners have accepted employment as a supervisor or manager with another contributing Employer and been responsible for causing such Employers to fail to comply with their obligations to keep accurate records and make all required contributions;

WHEREAS, the Trustees have determined that certain individuals and entities (as hereinafter defined "Deadbeat Employers") who engage in these practices willfully or with reckless disregard for their legal obligations or with repeated incompetence at the expense of their employees and the Fund have caused the Fund to incur large financial losses and employees to lose benefit coverage for which they had worked;

WHEREAS, the Trustees have concluded that such Deadbeat Employers' practices result in unfair competition for other contributing Employers often with the result of enriching

1

themselves and depriving lawful Employers of needed work, and depriving the Fund's participants of benefits;

WHEREAS, it is the desire of the Trustees to amend the Trust Agreement in order expressly to provide that the Fund may impose appropriate protective financial requirements on any Employer that is owned by or that hires a Deadbeat Employer in a managerial or supervisory role;

NOW THEREFORE, the undersigned Trustees of the Fund, pursuant to the authority of Article XII of the Restated Agreement and Declaration of Trust, do hereby adopt the following Amendment to the Restated Agreement and Declaration of Trust effective as of August 1, 2006:

## I.

**The following is added as an additional Paragraph under Article I, "Certain Definitions", Section 2, "Employer":**

"A "Deadbeat Employer" is defined as any entity or individual (including, but not limited to a corporation, partnership, or sole proprietorship and its respective officers, partners or owners) who have, or previously had in the last 10 years, incurred substantial liability to the Fund for delinquent contributions and then ceased operations or became insolvent, without satisfying such substantial liability and without any reasonable likelihood of paying the amounts due to the Fund. For purposes of this Section, substantial liability shall not be less than $30,000."

## II.

**The following is added as Section (4) to Article VII, "Funding Pension Plan Benefits":**

"<u>Section 4. ADDITIONAL REQUIREMENTS FOR DEADBEAT EMPLOYERS.</u>

(a)    <u>EMPLOYER OWNED BY DEADBEAT EMPLOYER.</u>  Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer that is owned, whether in whole or in part, by a Deadbeat Employer shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(b)    <u>EMPLOYER OPERATED BY DEADBEAT EMPLOYER.</u>  Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer whom the Trustees reasonably believe employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of

the Employer or contribution obligations of the Employer to the Fund shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(c)    <u>PROCEDURES BY WHICH AN EMPLOYER MAY AVOID LIABILITY UNDER THIS SECTION.</u>  The Fund shall send written notice (the "Notice") to any Employer whom the Trustees reasonably believe, is owned, in whole or part by a Deadbeat Employer, or who employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of the Employer or contribution obligations to the Fund.  The Notice will provide the Employer with a date certain, no less than 30 days after the date of transmittal of the Notice to the Employer, to provide evidence, satisfactory to the Trustees, that the Employer should not be subject to the provisions of subsections (a) or (b), as applicable,  as the Employer deems appropriate in order to avoid liability under this Section.  Any Employer, following the date set forth in the Notice from the Fund, who does not provide such satisfactory evidence to the Trustees, shall be subject to the obligations set forth in subsections (a) or (b), as applicable.  Any Employer who employs an officer or owner of a Deadbeat Employer in a non-managerial or non-supervisory position or in any other position in which the Deadbeat Employer does not exercise any control over the assets of the Employer or contribution obligations to the Fund will not be considered a successor employer and will not be required to post the bond described in this Section.

(d)    <u>MISCELLANEOUS PROVISIONS.</u>  The bond referenced in this Section shall be in addition to any other bond requirements set forth in the Written Agreement. The Trustees shall have discretion to waive the additional bond requirement or to reduce the amount of the bond, when, based on the specific circumstances, the Trustees determine it is reasonable to do so. Whenever a family member of a Deadbeat Employer purportedly has an ownership interest of an Employer that employs an officer, partner or owner of a Deadbeat Employer, there will be a rebuttable presumption that the Deadbeat Employer has substantial control over the assets of that Employer. "

<u>III.</u>

<u>Except as hereinbefore amended, the Trust Agreement shall remain in full force and effect in accordance with its terms.</u>

IN WITNESS WHEREOF, the undersigned Trustees have caused this Amendment to be executed on the dates appearing opposite their respective names.

| | | | | |
|---|---|---|---|---|
| _Charles Cohen_ | 9-18-06 | | _Joseph Coconato_ | 9/18/06 |
| **CHARLES COHEN** | **DATE** | | **JOSEPH COCONATO** | **DATE** |
| _Alan C. Esche_ | 9/18/06 | | _James P. Connolly_ | 9/18/06 |
| **ALAN ESCHE** | **DATE** | | **JAMES P. CONNOLLY** | **DATE** |
| _Robert Krug_ | 9/18/06 | | _J. Michael Lazzaretto_ | 9/18/06 |
| **ROBERT C. KRUG** | **DATE** | | **J. MICHAEL LAZZARETTO** | **DATE** |
| _Richard E. Grabowski_ | 9/18/06 | | _Frank Riley_ | 9/18/06 |
| **RICHARD E. GRABOWSKI** | **DATE** | | **FRANK RILEY** | **DATE** |
| _David H. Lorig_ | 9/18/06 | | _Larry Wright Jr._ | 9/18/06 |
| **DAVID H. LORIG** | **DATE** | | **LARRY WRIGHT** | **DATE** |
| _Gary Lundsberg_ | 9/18/06 | | _Jeff M. Ziemann_ | 9-18-06 |
| **GARY LUNDSBERG** | **DATE** | | **JEFF ZIEMANN** | **DATE** |

4

# RESTATED AGREEMENT AND DECLARATION OF TRUST OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY

EXHIBIT A4

Restated through
July 1, 2003

1

# ARTICLE VI
# EMPLOYER CONTRIBUTIONS

Section 1. IN GENERAL. In order to fund the Benefits provided for by this Agreement, each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees pursuant to regulations established by the Trustees at the times required by that agreement. The rate of contributions shall be determined by the applicable Collective Bargaining Agreements or Participation Agreements, together with any amendments, supplements or modifications thereto. Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation Agreement or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be not less than the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union having jurisdiction over the geographic area in which the covered Employees perform their work. No Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the foregoing provisions of this Section and any such contract or agreement shall be null and void. It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer had entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement. All contributions shall be paid in the manner and form required by the Trustees.

Section 2. DEFAULT IN PAYMENT OF CONTRIBUTIONS. Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity. Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment. The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed. All Employers party to or otherwise bound by this Agreement acknowledge that the liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10% waiving the necessity of any additional proof thereof. In addition, the delinquent contributions and any payments by the Employer pursuant to an installment agreement, shall bear interest, up to the prime rate plus two points, charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied. The Trustees are hereby given the power and authority, in their discretion, to assess a lesser amount or to waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee of the Board of Trustees and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Welfare

Fund. The Collection Committee may include trustees of the Laborers' Pension Fund as members of such Collection Committee.

In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, or refuses to provide the records required to be kept by contributing employers or submit to an audit, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process, including but not limited to, court fees, audit fees and investigative costs. The term "reasonable attorneys' fees" as used herein shall mean all attorneys' fees in the amounts for which the Trustees become legally obligated for actions seeking delinquent contributions, to compel an audit, or for recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees in lieu of any cash deposit a bond in an amount not less than Five Thousand Dollars ($5,000.00), or in an amount consistent with the terms of the current Collective Bargaining Agreement to which the Employer is subject. In the event an Employer is repeatedly delinquent in its contribution payments to the Welfare Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current Collective Bargaining Agreements in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3. REPORT ON CONTRIBUTIONS AND PRODUCTION OF RECORDS. The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees, on demand, the names of its employees, their social security numbers, the hours worked by each employee, and such other information as the Trustees may reasonably require in connection with the administration of the Trust. The Trustees may at any time have an audit made by an independent accounting firm of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures from the beginning of such Employer's participation in the Trust until given written authorization by the Administrator, upon request, to destroy said records. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning the Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

16

## ADDENDUM A

## RECORDS REQUIRED TO BE RETAINED BY EMPLOYERS
## AND PRODUCED FOR AUDITS

The following records shall be maintained and retained by all contributing employers to the Benefit Funds for at least six years from the contribution date and shall be produced for inspection and copying by an auditor of the Benefit Funds upon written request:

1. Quarterly and annual payroll tax returns, including, but not limited to, federal quarterly form 941's, federal annual form W-2's, W-3's, 940's, 1099's and state quarterly unemployment returns (form UC-3).

2. Payroll journals and/or registers which include or identify employees' social security numbers, hourly rates of pay, hours worked and the time period in which the work was performed.

3. Individual earnings records for all employees of the employer not shown on payroll journals or registers, including social security number and work classification (or code or clock or ID number), hourly rates of pay, hours worked and the time period in which the work was performed.

4. Cash disbursement journals and general ledgers.

5. Copies of all contribution reports and proof of payment (canceled checks or records of canceled checks) of all contributions to the Laborers' Funds and to all other trade union fringe benefit funds to which the employer contributed.

6. Copies of all dues records and proof of payment (canceled checks or records of canceled checks) of all union dues submitted to the Laborers' District Council.

7. Records showing all amounts paid to all persons or entities that performed work for the employer as independent contractors or subcontractors, if any, including copies of any federal form 1099's issued by the employer.

8. Daily time records filed by employees or supervisors.

9. Source documents and lists of job codes and equipment codes.

10. Certified payrolls for public sector jobs where such payrolls are required.

11. Employee personnel files including, but not limited to, last known addresses and telephone numbers, any documents which demonstrate employees' job classifications and/or status as an apprentice, journeyman, foreman, superintendent, or supervisor. (Confidential medical records or other private records not relevant to the establishment of an employee's job classification shall not be disclosed.)

1

12. Bank account statements and canceled checks from any account used in conjunction with the employer's business.

13. If records of all hours worked, rates of pay and classifications are not provided in the records listed in items 1 through 10, the employer shall maintain monthly lists of all employees not shown on payroll records, showing Social Security number and work classification (or code or clock or ID number), rates of pay and hours worked.

Honor Roll Employers shall be required only to produce basic records needed by the Benefit Funds' auditors to do an audit, specifically items 1 through 7 above. However, if an initial examination of such limited records discloses significant record keeping errors or failures to contribute, the auditor may request additional records listed above. In the absence of evidence of a deliberate failure by an Honor Roll Employer to contribute on behalf of a bargaining unit employee, the rebuttable presumptions provided for in the attached Policy for Retention and Production of Employer Records shall not apply to such Honor Roll Employer.

Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced. The judgment of the trustees in interpreting and applying this policy shall be conclusive and binding on all parties.

Adopted January 9, 2002

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR RETENTION AND PRODUCTION OF EMPLOYER RECORDS

As Adopted by the Boards of Trustees
Effective as of April 1, 2006

WHEREAS, Section 209 of the Employee Retirement Income Security Act of 1974 , as amended ("ERISA"), 29 U.S.C. Section1059, requires employers obligated to contribute to employee benefit funds to maintain records with respect to its employees which are sufficient to determine benefits due to such employees of which may become due to them; and

WHEREAS, the Trustees of the Laborers' Pension Fund and the Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds") have the authority under their respective Trust Agreements to establish rules, regulations and policies regarding records which must be maintained by employers in order to administer the Benefit Funds; and

WHEREAS, the Trustees of the Benefit Funds have found that most contributing employers maintain proper records and make all required contributions to the Benefit Funds, nevertheless, there are employers who are bound by the Trust Agreements of the Benefit Funds who fail to maintain records which are adequate for the Funds to determine whether proper contributions have been made on behalf of eligible employees and that some of such employers do so deliberately in order to avoid their obligations to make such payments; and

WHEREAS, the practices of employers who fail to maintain records sufficient to enable the Benefit Funds to conduct thorough payroll audits cause their employees to lose valuable pension and welfare benefits and cause the Benefit Funds to lose contractually required contributions and investment earnings on those contributions; and

WHEREAS, the practices of employers who fail to maintain adequate records cause the Benefit Funds to incur substantial additional administrative and legal expenses in order to determine proper amounts owed to the Funds by such employers; and

WHEREAS, enforcement of a policy specifying the records required to be maintained and produced increases the ability of the Funds to prove the contributions owed by delinquent employers and thereby to provide proper credit to the employees and their beneficiaries;

NOW THEREFORE, the Trustees resolve that the following policies are adopted by the Benefit Funds effective as of March 1, 2002:

1

1.  Except as otherwise provided herein, all contributing employers to the Benefit Funds shall maintain and make available for inspection and copying by an auditor of the Benefit Funds the records listed on Appendix A, attached hereto.

2.  Any employer obligated to contribute to the Benefit Funds who fails to maintain and make available for inspection and copying to an auditor of the Benefit Funds the requisite records listed on Appendix A shall bear the burden of proof with respect to the exclusion of any employee from coverage by the collective bargaining agreement with the Union.  In those cases where an employer asserts that an employee is excluded because he/she is a member of another bargaining unit, the employer must submit tangible evidence of that fact, e.g., a union membership card, contribution records maintained for the benefit funds of the other bargaining unit, commercial drivers' license if it is asserted that an employee is a truck driver rather than a laborer and workers' compensation policies, forms and applications listing an employee's job classification or other business records.  The affidavit of an employer's representative or officer unsupported by documentary evidence shall not be sufficient to meet the employer's burden of proof.   Affidavits solicited and obtained ex parte by an employer's representative from employees, for which there is no corroborative evidence in the form of records maintained in the ordinary course of business, shall not be sufficient to meet the employer's burden of proof.

3.  When an employer has failed to maintain or make available the requisite records, there shall be a rebuttable presumption that any employee listed as a possible laborer by an auditor, Field Representative or attorney representing the Benefit Funds was a laborer. There shall also be rebuttable presumptions concerning the hourly rate and number of hours worked as follows: (a) that the employee was paid only $10.00 per hour if no record of wage rates was made by the employer, and/or (b) that the employee worked 72 hours per week if no record of the number of hours was maintained; whichever of these presumptions results in the higher amount of contributions shall be applied.  When evidence exists that a different hourly rate was paid to employees of an employer that failed to maintain the required records, at the discretion of the Director of the Field Department, a different hourly rate may be presumed for purposes of determining the amount of contributions owed by the employer.  If that evidence shows that the employer paid a rate lower than $10.00 per hour to any employees doing bargaining unit work, then that lower rate shall be presumed to be the actual rate paid to all employees for whom adequate records were not kept.  Similarly, where evidence exists of a different number of hours worked, the Director may apply a different number of hours for determining the contributions owed, and this number of hours worked shall be presumed correct.  All wages computed as provided in this paragraph shall be presumed to be paid as straight time wages regardless of the number of hours worked unless the employer has provided documentation, in the form required by the terms of this policy, showing that it followed the requirements of the Fair Labor Standards Act and/or the applicable collective bargaining agreement as to the payment of overtime.

4.  An employer that fails to maintain the requisite records and fails to cooperate with the Trustees in establishing the paid wage rates, actual hours of work and contributions owed to the Benefit Funds shall be liable to the Benefit Funds and any related organizations, for the contribution amounts determined as provided herein and also for 20% liquidated damages, compound interest at the rate of prime plus 2 points (as determined by the Administrator), auditor's and attorney's fees and any other expenses of collection including investigative costs.

2

# LABORERS' PENSION AND WELFARE FUNDS

## POLICY FOR SCHEDULING OF AUDITS

As Adopted by The Boards of Trustees
Effective as of April 1, 2006

Contributing employers to the Laborers' Pension Fund and the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity (collectively, the "Benefit Funds"), shall be audited periodically in accordance with the procedures adopted by the Collection Committee of the Benefit Funds. The Director of the Field Department, in cooperation with the Benefit Funds' auditors, shall prepare a schedule for auditing contributing employers in accordance with the following procedures.

Two types of audits shall be conducted: "full audits" in which payroll and other records on all employees are examined and "sampling audits" in which a selection of payroll and other records are tested to enable the compliance auditor to make a reasonable determination that there are no delinquencies. A sampling audit should include a review of all types of records (e.g. payroll records, tax records, cash disbursement records, reports to other benefit funds, etc.) Where a sampling audit discloses delinquencies or related record discrepancies, a full audit shall be conducted.

Employers shall be scheduled for either full audits or sampling audits in groups based upon the contribution histories of the employers. Either a sampling or full audit shall be conducted at least once every five (5) years. Any employer that fails to schedule an audit and submit records for review within 45 days from the date of the audit request will be liable for all costs of compelling and enforcing the audit request. The following procedures shall be used:

## AUDIT PERIOD

1. **New Employers**. New employers shall be scheduled for audits within the first year in which contributions to the Benefit Funds are required.

2. **Honor Roll Employers.** Employers with a history of adequate record keeping and timely, payments to the Benefit Funds ("Honor Roll Employers"), shall be required to submit to audits every three (3) to five (5) years. Following an audit showing adequate record keeping and correct payments, such an employer shall be designated an Honor Roll Employer and shall be selected randomly for an audit between the third and fifth year thereafter. (Such employers may opt for a scheduled audit every three years.) An inadvertent shortage of no more than the greater of $1000 or two percent (2%) of required contributions determined on a full audit covering three or more years of contributions to the Benefit Funds shall not disqualify an employer from inclusion in this group.

3. **Other Contributing Employers**. Employers that are not classified as New or Honor Roll Employers or who have been assessed significant delinquencies to the Benefit Funds or any of the ancillary funds to which contributions are owed pursuant to the collective bargaining agreements of the Laborers' District Council shall be scheduled for full audits at least once every three (3) years.

4. **Employers Subject to Special Audits**. At the discretion of the Director of the Field Department full audits of employers obligated to contribute to the Benefit Funds may be conducted at any time based upon information concerning possible delinquencies, e.g., failure to file monthly remittance reports, failure to pay contractually required wage rates, information concerning a possible closing or sale of the business, information that the employer is operating an alter ego or similar bases suggesting possible delinquencies.

## FULL AND SAMPLING AUDITS

1. **New Employers**. If there is a sufficient number of employees of a New Employer, the auditor of the Benefit Funds may do a sampling audit to determine if the employer is maintaining accurate records and making required contributions, otherwise the auditor will do a full audit. An important purpose of audits for new employers is to inform employers of the procedures for contributing to the Benefit Funds and the requisite records to be maintained. *

2. **Honor Roll Employers**. Sampling audits shall be used for Honor Roll Employers if they have sufficient employees to warrant use of sampling methods. If a sampling audit discloses inaccurate or incomplete record keeping or evidence of significant delinquencies, a full audit shall be done.

3. **Other Contributing Employers**. Full audits shall be conducted if employers are not qualified as New or Honor Roll Employers.

4. Notwithstanding the foregoing, the Collection Committee or the Director of the Field Department may, in their discretion, determine that a full audit shall be done of any employer or that, where a sampling audit is to be conducted, specific records shall be produced.*

* For information concerning the requisite records to be maintained, see the Laborers' Pension and Welfare Funds Policy for Retention and Production of Employer Records, effective as of April 1, 2006 and the Records Required to be Retained By Employers and Produced for Audits adopted January 9, 2002.

# AMENDMENT TO THE
## RESTATED AGREEMENT AND DECLARATION OF TRUST
## OF THE HEALTH AND WELFARE DEPARTMENT OF THE CONSTRUCTION AND
## GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY

WHEREAS, Article XI of the Restated Agreement and Declaration of Trust ("Trust Agreement") provides that the Board of Trustees of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity ("Fund") have the authority to amend the Trust Agreement;

WHEREAS, Article IV of the Fund's Trust Agreement sets forth the powers and duties of the Trustees;

WHEREAS, the Trustees have an obligation to protect the interests of the Plan's Participants and to protect the assets of the Fund;

WHEREAS, the Trustees are aware of situations in which contributing Employers have ceased business operations leaving a large indebtedness to the Fund without a reasonable likelihood of the Fund collecting such delinquent contributions;

WHEREAS, the individual officers and owners of some Employers have secured jobs knowing that they will not comply with their legal obligations to the Fund by keeping accurate records of their laborer employees' employment and make all the required contributions to the Fund; and

WHEREAS, such illegal conduct causes substantial losses to the Fund and deprives Employers who comply with its obligations to the Fund of opportunities to secure employment for their laborer employees; and

WHEREAS, the individual officers, partners or owners of some contributing Employers have used various entities to avoid liability to the Fund for contributions that would otherwise be due and then created new companies in order to continue to operate using such illegal practices;

WHEREAS, in some instances such individual officers or owners have accepted employment as a supervisor or manager with another contributing Employer and been responsible for causing such Employers to fail to comply with their obligations to keep accurate records and make all required contributions;

WHEREAS, the Trustees have determined that certain individuals and entities (as hereinafter defined "Deadbeat Employers") who engage in these practices willfully or with reckless disregard for their legal obligations or with repeated incompetence at the expense of their employees and the Fund have caused the Fund to incur large financial losses and employees to lose benefit coverage for which they had worked;

WHEREAS, the Trustees have concluded that such Deadbeat Employers' practices result in unfair competition for other contributing Employers often with the result of enriching themselves and depriving lawful Employers of needed work, and depriving the Fund's participants of benefits;

WHEREAS, it is the desire of the Trustees to amend the Trust Agreement in order expressly to provide that the Fund may impose appropriate protective financial requirements on any Employer that is owned by or that hires a Deadbeat Employer in a managerial or supervisory role;

NOW THEREFORE, the undersigned Trustees of the Fund, pursuant to the authority of Article XII of the Restated Agreement and Declaration of Trust, do hereby adopt the following Amendment to the Restated Agreement and Declaration of Trust effective as of August 1, 2006:

## I.

**The following is added as an additional Paragraph under Article I, "Certain Definitions", Section 2, "Employer":**

"A "Deadbeat Employer" is defined as any entity or individual (including, but not limited to a corporation, partnership, or sole proprietorship and its respective officers, partners or owners) who have, or previously had in the last 10 years, incurred substantial liability to the Fund for delinquent contributions and then ceased operations or became insolvent, without satisfying such substantial liability and without any reasonable likelihood of paying the amounts due to the Fund. For purposes of this Section, substantial liability shall not be less than $30,000."

## II.

**The following is added as Section (4) to Article VI, "Employer Contributions":**

"<u>Section 4. ADDITIONAL REQUIREMENTS FOR DEADBEAT EMPLOYERS.</u>

(a)    <u>EMPLOYER OWNED BY DEADBEAT EMPLOYER.</u>  Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer that is owned, whether in whole or in part, by a Deadbeat Employer shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(b)    <u>EMPLOYER OPERATED BY DEADBEAT EMPLOYER.</u>  Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer whom the Trustees reasonably believe employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of

2

the Employer or contribution obligations of the Employer to the Fund shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(c) PROCEDURES BY WHICH AN EMPLOYER MAY AVOID LIABILITY UNDER THIS SECTION. The Fund shall send written notice (the "Notice") to any Employer whom the Trustees reasonably believe, is owned, in whole or part by a Deadbeat Employer, or who employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of the Employer or contribution obligations to the Fund. The Notice will provide the Employer with a date certain, no less than 30 days after the date of transmittal of the Notice to the Employer, to provide evidence, satisfactory to the Trustees, that the Employer should not be subject to the provisions of subsections (a) or (b), as applicable, as the Employer deems appropriate in order to avoid liability under this Section. Any Employer, following the date set forth in the Notice from the Fund, who does not provide such satisfactory evidence to the Trustees, shall be subject to the obligations set forth in subsections (a) or (b), as applicable. Any Employer who employs an officer or owner of a Deadbeat Employer in a non-managerial or non-supervisory position or in any other position in which the Deadbeat Employer does not exercise any control over the assets of the Employer or contribution obligations to the Fund will not be considered a successor employer and will not be required to post the bond described in this Section.

(d) MISCELLANEOUS PROVISIONS. The bond referenced in this Section shall be in addition to any other bond requirements set forth in the Written Agreement. The Trustees shall have discretion to waive the additional bond requirement or to reduce the amount of the bond, when, based on the specific circumstances, the Trustees determine it is reasonable to do so. Whenever a family member of a Deadbeat Employer purportedly has an ownership interest of an Employer that employs an officer, partner or owner of a Deadbeat Employer, there will be a rebuttable presumption that the Deadbeat Employer has substantial control over the assets of that Employer. "

III.

Except as hereinbefore amended, the Trust Agreement shall remain in full force and effect in accordance with its terms.

3

May 03 2007 12:20pm From-Laborers Pen & Wel Funds + T-351 P.009/009 F-615

IN WITNESS WHEREOF, the undersigned Trustees have caused this Amendment to be executed on the dates appearing opposite their respective names.

| | | |
|---|---|---|
| CHARLES J. GALLAGHER | DATE | JAMES P. CONNOLLY — 9/19/06 DATE |
| ALAN ESCHE — 9/19/06 DATE | | RANDY DALTON — 9/19/06 DATE |
| RICHARD E. GRABOWSKI — 9/19/06 DATE | | MARTIN FLANAGAN — 9-19-06 DATE |
| DAVID H. LORIG — 9/19/06 DATE | | LIBERATO NAIMOLI — 9/19/06 DATE |
| DENNIS MARTIN — 9/19/06 DATE | | SCOTT PAVLIS — 9/19/06 DATE |
| TIM J. SCULLY — 9/19/06 DATE | | FRANK RILEY — 9/19/06 DATE |

4

# AGREEMENT
# AND
# DECLARATION OF TRUST
# OF THE
# CHICAGO LABORERS'
# DISTRICT COUNCIL
# RETIREE HEALTH AND
# WELFARE FUND

EXHIBIT A5

Effective as of
June 1, 2014

weighted) of Union Trustees and Employer Trustees;

(e) If a Trustee is absent from a meeting of the Board of Trustees, he may, but need not, cast a vote on any matter by written instrument filed with or telegram addressed to the Board of Trustees; and

(f) If a Trustee is absent from any meeting, then, to the extent permitted by law, he shall not be liable for any matter considered at that meeting on which he has not case a vote as provided by the foregoing sentence.

The certificate of one Employer Trustee and one Union Trustee or of the Administrator that the Board of Trustees has taken or authorized any action shall be conclusive in favor of any person relying on the certificate.

Section 2.  RECORD OF TRUSTEES ACTIONS.  The Trustees may select a Secretary to serve for a term of three (3) calendar years or until a successor has been duly elected.  The Administrator, or in his absence a person appointed by the Trustees, shall prepare a draft of the minutes of each meeting and provide a copy to the Trustees as soon as practicable after the meeting is held.  The Trustees will review and approve the minutes.

The Administrator shall act as the Fund's executive officer, with full power of administration under the general direction of the Trustees.  The Trustees are specifically authorized to delegate to the Administrator any of the powers vested in the Trustees by this Agreement.

Section 3.  ADMINISTRATIVE PERSONNEL.  The Board of Trustees shall appoint the Administrator, actuary, Fund Counsel, auditor and such other managerial and legal and administrative staff as they deem reasonably necessary for the efficient administration of the Trust, and may delegate the appointment of Fund personnel to the Administrator.

Section 4.  DISBURSEMENT OF RETIREE WELFARE FUND.  The Administrator, or any other Retiree Welfare Fund employee designated by the Trustees, may sign checks for any disbursement from the Retiree Welfare Fund approved by the Trustees.

Section 5.  EXECUTION OF NOTICES AND DOCUMENTS.  Except as specifically provided in Section 4 next above, the Board of Trustees may designate any equal number of Union Trustees and Employer Trustees to jointly execute, in writing, on behalf of the Board of Trustees, any notice or document, which executed notice or document shall be conclusive in favor of any person relying thereon.

## ARTICLE VI
## EMPLOYER CONTRIBUTIONS

Section 1.  IN GENERAL.  In order to fund the retiree benefits provided for by this Agreement, each Employer, for the period that it is obligated by a Written Agreement, shall make contributions to the Trustees pursuant to regulations established by the Trustees at the times required by that agreement.  The rate of contributions shall be determined by the applicable

Collective Bargaining Agreements or Participation Agreements, together with any amendments, supplements or modifications thereto. Notwithstanding the preceding sentence, if an Employer is required to make contributions by reason of a Participation Agreement or other Written Agreement that is not a Collective Bargaining Agreement, the amount of its contributions shall be not less than the amount required by the Collective Bargaining Agreement in effect between the Employer Association and the Union having jurisdiction over the geographic area in which the covered Employees perform their work. No Employee shall be permitted to contract or otherwise agree with or permit his Employer to provide wage or benefit payments which do not conform with the amount of contributions required under the foregoing provisions of this Section and any such contract or agreement shall be null and void. It shall not be a defense to any claim by the Trustees or an Employee for payment of delinquent contributions from an Employer that such Employer had entered into an agreement with any Employee purporting to waive the Employee's right to strict compliance with the provisions of the applicable Collective Bargaining Agreement or a Participation Agreement. All contributions shall be paid in the manner and form required by the Trustees.

      Section 2. DEFAULT IN PAYMENT OF CONTRIBUTIONS. Nonpayment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payments. The Trustees may take any action necessary to enforce payment of the contributions and penalties due hereunder, including, but not limited to, proceedings at law and in equity. Any such action shall not prejudice the Union in any action it may wish to take on account of such nonpayment. The Trustees are authorized to establish a reasonable and lawful grace period by which contributions must be received; Employers making contributions that are not received before the expiration of said period and any Employer making late payments due under an installment agreement shall be assessed liquidated damages of 10% of the amount of the contributions which are owed. All Employers party to or otherwise bound by this Agreement acknowledge that the liquidated damages will be used to defer administrative costs arising by said delinquency and acknowledge the costs to be actual and substantial though difficult to ascertain; however the Employers acknowledge these costs to be at a minimum of 10% waiving the necessity of any additional proof thereof. In addition, the delinquent contributions and any payments by the Employer pursuant to an installment agreement, shall bear interest, up to the prime rate plus two points, charged by the Fund's custodian bank (or any other bank selected by the Trustees) or such other lawful amount as determined by the Trustees from the due date until totally satisfied. The Trustees are hereby given the power and authority, in their discretion, to assess a lesser amount or to waive or suspend payment of liquidated damages, interest, audit fees or investigative costs in accordance with rules and procedures adopted by the Collection Committee of the Board of Trustees and to compromise claims for delinquent contributions and related liabilities and collection costs where appropriate to settle cases favorably for the Retiree Welfare Fund. The Collection Committee may include trustees of the Laborers' Pension Fund as members of such Collection Committee.

      In the event an Employer party to this Agreement or otherwise bound thereby becomes delinquent in his contributions or an installment agreement, or fails to post a bond as required, or refuses to provide the records required to be kept by contributing employers or submit to an audit, said delinquent Employer shall be liable for reasonable attorneys' fees and for all reasonable costs incurred in the collection process, including but not limited to, court fees, audit

fees and investigative costs. The term "reasonable attorneys' fees" as used herein shall mean all attorneys' fees in the amounts for which the Trustees become legally obligated for actions seeking delinquent contributions, to compel an audit, or for recovery of liquidated damages, audit costs, filing fees and any other expenses incurred by the Trustees.

The Trustees are hereby given the power and authority in their discretion, to require any Employer to deposit with the Trustees, in advance, as a guarantee for the payment of monthly contributions, an amount equal to three (3) times the monthly contributions of such Employer, as estimated by the Trustees. At the option of the Trustees the Employer shall furnish the Trustees in lieu of any cash deposit a bond in an amount not less than Five Thousand Dollars ($5,000.00), or in an amount consistent with the terms of the current Collective Bargaining Agreement to which the Employer is subject. In the event an Employer is repeatedly delinquent in its contribution payments to the Retiree Welfare Fund, the Trustees have the power and authority to require that Employer to purchase a bond in excess of $5,000.00 or the amounts set forth in the current Collective Bargaining Agreements in an amount equal to three (3) times the highest monthly contributions of the Employer in the twelve months prior to any delinquency. The Trustees, in their discretion, may also waive the requirement of a cash deposit or a surety bond in lieu of a personal guaranty when such waiver is warranted.

Section 3. REPORT ON CONTRIBUTIONS AND PRODUCTION OF RECORDS. The Employers shall make all reports on contributions required by the Trustees. Each Employer shall promptly furnish to the Trustees, on demand, the names of its employees, their social security numbers, the hours worked by each employee, and such other information as the Trustees may reasonably require in connection with the administration of the Trust. The Trustees may at any time have an audit made by an independent accounting firm of the payroll of any Employer in connection with the said contributions and/or reports. All Employers shall be required to maintain records in compliance with procedures from the beginning of such Employer's participation in the Trust until given written authorization by the Administrator, upon request, to destroy said records. The Administrator shall require the Employer to designate the classification of all of his employees and if the Employer fails to do so, the Trustees shall conduct an investigation for the purpose of determining the classification of such employees and the results of said investigation shall be conclusive. Attached hereto as Addendum A are the current collection policies concerning the Scheduling of Audits and Retention and Production of Employer Records adopted by the Trustees.

Section 4.  ADDITIONAL REQUIREMENTS FOR DEADBEAT EMPLOYERS.

(a) EMPLOYER OWNED BY DEADBEAT EMPLOYER. Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer that is owned, whether in whole or in part, by a Deadbeat Employer shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employers and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(b) EMPLOYER OPERATED BY DEADBEAT EMPLOYER. Subject to the provisions of subsection (c) and following 30 days after receipt by the Employer of the Notice described therein, any Employer whom the Trustees reasonably believe employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the Deadbeat Employer may exercise any control over the assets of the Employer or contribution obligations of the Employer to the Fund shall be deemed by the Fund as a successor employer to the Deadbeat Employer for purposes of the delinquent contribution obligations of the Deadbeat Employer to the Fund and shall (i) be liable to the Fund for the unpaid liabilities of the Deadbeat Employer and (ii) be required to post a bond for the benefit of the Fund in an amount equal to twice the amount of the Deadbeat Employer's prior delinquencies to the Fund.

(c) PROCEDURES BY WHICH AN EMPLOYER MAY AVOID LIABILITY UNDER THIS SECTION. The Fund shall send written notice (the "Notice") to any Employer whom the Trustees reasonably believe, is owned, in whole or part by a Deadbeat Employer, or who employs an officer, partner or owner of a Deadbeat Employer in a managerial or supervisory position or in any other responsible position in which the deadbeat Employer may exercise any control over the assets of the Employer or contribution obligations to the Fund. The Notice will provide the Employers with a date certain, no less than 30 days after the date of transmittal of the Notice to the Employer, to provide evidence, satisfactory to the Trustees, that the Employer should not be subject to the provision of subsection (a) or (b), as applicable, as the Employer deems appropriate in order to avoid liability under this Section. Any Employers, following the date set forth in the Notice from the Fund, who does not provide such satisfactory evidence to the Trustees, shall be subject to the obligations set forth in subsections (a) or (b), as applicable. Any Employer who employs an officer or owner of a Deadbeat Employer in a non-managerial or non-supervisory position or in any other position in which the Deadbeat Employer does not exercise any control over the assets of the Employer or contribution obligations to the Fund will not be considered a successor employer and will not be required to post the bond described in this Section.

(d) <u>MISCELLANEOUS PROVISIONS.</u> The bond reference in the Section shall be in addition to any other bond requirements set forth in the Written Agreement. The Trustees shall have discretion to waive the additional bond requirement or to reduce the amount of the bond, when, based on the specific circumstances, the Trustees determine it is reasonable to do so. Whenever a family member of a Deadbeat Employer purportedly has an ownership interest of an Employer that employs an officer, partner or owner of a Deadbeat Employer, there will be a rebuttable presumption that the Deadbeat Employer has substantial control over the assets of that Employer.

## ARTICLE VII
## FILING CLAIMS AND REVIEW OF DENIAL OF CLAIM

Section 1. FILING OF A CLAIM. Claims for the payment of any retiree benefits shall be filed, in writing, via common carrier, U.S. mail or electronic mail, in accordance with the Rules and Regulations of the Retiree Welfare Fund.

Section 2. ADJUDICATION OF CLAIMS AND APPEALS. The Trustees shall have the authority to adopt procedures for the review of claims and appeals of claims denied in whole or in part in accordance with ERISA and regulations adopted pursuant to ERISA. The Trustees have delegated authority to decide claims to the Claims Department and to decide appeals to the Claims Committee of the Board of Trustees. The procedures may be changed from time to time at the discretion of the Board of Trustees. The current procedures for claims and appeals are set forth in the Summary Plan Description of the Retiree Welfare Fund.

The Trustees and/or the Claims Committee have full discretionary authority to determine eligibility for Benefits under the Plan and to interpret the Plan, all Plan documents, rules, procedures, and the terms of the Trust Agreement. Their decisions and interpretations will be given the maximum deference permitted by law for the exercise of such full discretionary authority, they will be binding upon all involved persons.

## ARTICLE VIII
## DUTY TO COOPERATE

All of the Trustees and all directors, officers, employees or other representatives of any Employer Association or Council party to this agreement shall be required to assist and cooperate with authorized representatives of the Retiree Welfare Fund, its attorneys, auditors, or other authorized representatives in the prosecution of claims for or against the Retiree Welfare Fund.

Specifically, an Employer shall provide to the Board of Trustees on request in the course of any audit deemed necessary or advisable by the Trustees the records set forth in the Policy for Retention and Production of Employer Records attached hereto as Addendum A.

EMPLOYER TRUSTEES:

Julie Chamberlin

Date _____ 5-12-14 _____

Charles J. Gallagher

Date _____ 5-12-14 _____

Clifton M. Horn

Date _____ 5-12-14 _____

David H. Lorig

Date _____ 5/12/14 _____

Dennis P. Martin

Date _____ 5/12/14 _____

Anthony J. Riccardi

Date _____ 5/12/14 _____

UNION TRUSTEES:

Antonio S. Castro

Date _____ 05-12-14 _____

James P. Connolly

Date _____ 5-12-14 _____

Martin T. Flanagan

Date _____ 5-12-14 _____

Richard Kuczkowski

Date _____ 5-12-14 _____

Charles V. Loverde, III

Date _____ 5-12-14 _____

Scott Pavlis

Date _____ 5-12-14 _____

20

AGREEMENT AND DECLARATION OF TRUST
ESTABLISHING
THE CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY
TRAINING TRUST FUND

THIS AGREEMENT AND DECLARATION OF TRUST, made and entered into as of the 1st day of June, 1986 by and between THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, A.F.L.-C.I.O., representing its affilated Local Unions and the members thereof (the "Council") and the BUILDERS' ASSOCIATION OF CHICAGO, the UNDERGROUND CONTRACTORS ASSOCIATION, and the ILLINOIS ROAD BUILDERS' ASSOCIATION, and all other employer associations (the "Associations") who have hereto bargained or may hereafter bargain or enter into collective bargaining agreements or other agreements with the Union, its local affiliates, or with representatives of this Trust, for and on behalf of themselves and their respective members who by virtue of their said membership or otherwise are parties to collective bargaining agreements with the Union or any of its local affiliates or are parties to this Agreement or are otherwise bound to the provisions hereof as hereinafter provided, and other employers in the building and construction industry who may not be members of any association but who are included in the term "Employers" (as defined in Section 2 of ARTICLE I) and agree to be bound by this Agreement or who are otherwise so bound as provided as set forth in Section 2 of ARTICLE I;

WITNESSETH:

(1)  The Employers are parties to a collective bargaining agreement, or supplements thereto, with the Council which requires

-1-

EXHIBIT
A-6

Employer contributions of a certain sum per hour per Employee to a training fund provided in a program to be created for participating employees and established by this trust agreement.

(2) the parties have agreed that such contributions shall be payable to and be deposited in the Trust Fund created and established by this Trust Agreement.

NOW, THEREFORE, in consideration of the premises and in order to establish and provide for the maintenance of said Trust Fund to be known as "THE CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY TRAINING TRUST FUND" hereinafter referred to as the "Trust Fund," it is mutually understood and agreed as follows.

## ARTICLE I

### Definitions

Unless the context or subject matter otherwise requires, the following definitions shall govern in this Trust Agreement.

### Section 1. WRITTEN AGREEMENT

The term "Written Agreement" shall mean any agreement in writing which specifies the detailed basis on which contributions shall be made to this Trust together with any modification, amendment or renewals thereof, including but not limited to Collective Bargaining Agreements, memoranda of understanding which incorporate by reference Collective Bargaining Agreements or this Agreement, report forms in accordance with which contributions are made and which obligate the Employer to the provisions of this Agreement, or any other agreement obligating the Employer signatory thereto to participate in or be bound by this Agreement.

-2-

signatory association, nor any officers, agent, employee or committee member of the Employers, or of any signatory association shall be liable to make contributions to the Fund or be under any other liability to the Fund or with respect to the Training Program, except to the extent that he may be an individual Employer required to make contributions to the Fund with respect to his or its own individual or joint venture operations, or to the extent he may incur liability as a Trustee, as hereinafter provided. The liability of any individual Employer to the Fund, or with respect to the Training Program shall be limited to the payments required by any written agreement with respect to his or its individual or joint venture operations, and in no event shall he or it be liable or responsible for any portion of the contributions due from other individual Employers with respect to the operations of such Employers. The individual Employers shall not be required to make any further payments or contributions to the cost of the operations of the Fund or of the Training Program, except as provided in Section 8 of this Article.

Section 6. Neither the Employers, any signatory association, any individual Employer, the Council, nor any employee shall be liable or responsible for any debts, liabilities or obligations of the Fund or the Trustees.

Section 7. Contributions to the Fund shall be due and payable to the principal office of the Fund and shall be made in regular monthly installments except as otherwise herein provided in Section 9 of this Article II. Each contribution to the Fund shall be made promptly, and in any event on or before the 10th day

of the calendar month in which it becomes due and payable. Each monthly contribution shall include all payments which have accrued in the interim for work performed up to the close of the Employer's payroll period ending closest to the last day of the preceding calendar month. Each monthly contribution shall be accompanied by a report in a form prescribed by the Board of Trustees.

Section 8. The parties recognize and acknowledge that the regular and prompt payment of Employer contributions and reports to the Fund are essential to the maintenance of the Fund and that it would be extremely difficult, if not, impracticable, to fix the actual expense and damage to the Fund and to the Training Program which would result from the failure of an Employer to pay such monthly contributions in full within the time provided above. Therefore, if any Employer is delinquent in remitting its contributions within the time specified in Section 7 of this Article, the amount of damage to the Fund and Training Program resulting from failure to make reports or pay contributions within the time above specified shall be presumed to be the sum of ten percent (10%) of the amount of the contribution due for each delinquent report or contribution. This amount shall be added as liquidated damages upon the day immediately following the date on which the report or the contribution or contributions become delinquent. Delinquent contributions and penalties shall also bear interest at a rate up to the prime rate of interest as recognized by the First National Bank of Chicago or such other lawful amount as determined by the Trustees from the due date until

delinquency is totally satisfied. The Trustees, however, in their discretion, for good cause (Trustees shall have sole right to determine what shall constitute good cause) shall have the right and power to waive all or any part of any sums due the Fund as liquidated damages. Failure by any Employer to make the required payments hereunder shall be deemed a breach of the written agreement by the Employer and be subject to economic action by the Council in addition to the other remedies as provided herein. The Trustees may, at their option, also take legal action to collect all delinquent amounts owing to the Fund, and parties agree that if the delinquent account of any Employer is referred to an attorney for collection, such Employer shall immediately become liable for a reasonable sum for the attorneys' fee together with an amount equal to all costs incurred by the Trustees in commencing or prosecuting legal action in any Court. In such legal action, venue shall be laid at Cook County, Illinois, as the Fund is administered in such county.

Section 9. In the case of certain Employers who have defaulted on payments in the past, or who otherwise give the Trustees reasonable cause to feel insecure as to future contributions, the Trustees shall have the power to require a bond for the payment of contributions.

## ARTICLE III

### Board of Trustees

Section 1. Except as otherwise specifically provided, the Fund shall be operated and administered by a Board of Trustees whose membership shall consist of three persons appointed as trustees by the Association (known as the "Association Appointed

**AMENDED AND RESTATED**
**COLLECTION POLICIES AND PROCEDURES**
of the
**CHICAGO LABORERS' PENSION AND WELFARE FUNDS**
**EFFECTIVE: NOVEMBER 11, 2019**

The Collection Committee has been established by the Boards of Trustees of the Laborers' Pension Fund, the Laborers' Welfare Fund of the Health and Welfare Department of the Construction and General Laborers' District Council of Chicago and Vicinity, and the Chicago Laborers' District Council Retiree Health and Welfare Fund ("Funds") and has been delegated plenary authority to oversee the collection activities of the Funds and to establish, maintain, implement and interpret uniform collection policies and procedures. The following Collection Policies and Procedures ("Collection Policy") are being adopted by the Collection Committee for the Funds and also, as applicable, for the affiliated ancillary funds and the Construction and General Laborers' District Council of Chicago and Vicinity ("District Council") for which the Funds act as collection agent by agreement.

This Collection Policy shall apply to Contributing Employers, and may be modified from time to time by the Boards of Trustees, in their sole and unrestricted discretion. In this Collection Policy, the term "Contributing Employer" means any entity obligated to remit contributions to the Funds and affiliated ancillary funds and union dues to the District Council on behalf of its employees engaged in Covered Employment, as required pursuant to the Funds' respective Agreements and Declarations of Trust. The Collection Committee has full discretion in interpreting and applying this Collection Policy and their interpretation and application thereof shall be conclusive and binding on all parties.

---

A. <u>Authorization to Collect Dues Contributions</u>
   1. Pursuant to agreement, the Funds are authorized by the District Council to collect from Contributing Employers delinquent or unpaid union dues.

B. <u>Methods of Submission</u>
   1. Unless directed otherwise in writing by Fund Counsel, Employer Contributions shall be payable to the Funds using one of the following methods:
      a. By mail to the Funds' lockbox (**33367 Treasury Center, Chicago, Illinois 60694-3300**), with the accompanying contribution report ("Contribution Report") enclosed with payment; or
      b. Online via the Funds' secure Contractor Web Reporting system (**www.chicagolaborersfunds.com**).
   2. Unless directed otherwise in writing by Fund Counsel, Employer Contributions and their accompanying Contribution Reports shall be submitted only as described in Section B(1), above. Contribution Reports and Contributions not

**Exhibit A-7**

received by the Funds in one of these two manners shall be deemed unsubmitted and subject to liquidated damages as described below in Section D.

3. Fund Counsel may direct a Contributing Employer to submit Employer Contributions and Contribution Reports in a manner other than those listed in Section B(1). Should Fund Counsel so direct a Contributing Employer, Section B (2) shall be inapplicable, but only in regards to the specific Reports and Employer Contributions Fund Counsel has authorized to be submitted in a different manner.

4. Contribution Reports must be in a form approved by the Funds: submitted online via the Contractor Web Reporting system or on the Contribution Reports provided by the Funds and signed by an authorized officer, partner, or agent of the Contributing Employer. No other type of contribution report (example, employer-created Excel workbook) will be accepted, and the accompanying Employer Contributions will be deemed delinquent if not submitted with a compliant Contribution Report.

C. Due Dates

1. Employer Contributions and Contribution Reports shall be received by the Funds on or before the tenth day of the first month following the month in which covered work was performed, and are delinquent on the tenth day of the second month following the month in which covered work was performed. Any Contributions received on or after the eleventh day of the second month will be assessed liquidated damages.

2. The submission and delinquency dates for Contribution Reports and Contributions to the affiliated ancillary funds and union dues to the District Council may differ from those in Section C(1). Please refer to the applicable collective bargaining agreement or contact each organization for the specific dates on which union dues and contributions to the affiliated ancillary funds are due and are delinquent.

D. Assessment of Liquidated Damages

1. Liquidated damages will be assessed at 10% of the Contributions owed on delinquent reports.

2. Liquidated damages will be waived for one delinquent Contribution Report if a Contributing Employer has submitted Contributions on time for the twelve month period immediately preceding the delinquent Contribution and is not currently on an Installment Note.

3. Should Fund Counsel file a lawsuit against a Contributing Employer, any liquidated damages incurred by that Contributing Employer after the lawsuit is filed will be assessed liquidated damages at 20% of the Contributions owed.

4. Contributions found owing pursuant to a payroll audit will be assessed liquidated damages at 20% of the Contributions owed. A reduction of liquidated damages to 10% of the Contributions owed may be applied if the payroll audit findings are

paid within thirty days of the date of the cover letter accompanying the payroll audit report.

E.  Assessment of Interest
    1.  The charges for interest and for liquidated damages are separate computations.
    2.  Delinquent Contributions and any payments owed by a Contributing Employer pursuant to an installment agreement and/or delinquencies identified in a payroll audit shall bear interest in the amount of twelve percent per annum, compounded, or such other lawful amount as determined by the Collection Committee, from the due date until the obligation is fully satisfied.

F.  Additional Costs
    1.  A Contributing Employer shall bear the costs of any payroll audit:
        a.  if the payroll audit findings show a delinquency of the greater of, $1,000 or 2% of the Contributing Employer's required contributions during the payroll audit period;
        b.  which was compelled by a lawsuit; or
        c.  if a lawsuit is filed to collect the delinquencies.
    2.  A Contributing Employer shall be liable for the Funds' reasonable attorneys' fees and costs should Fund Counsel file a lawsuit against that Employer.
    3.  Payroll audit costs and attorneys' fees and costs shall be added to any delinquent amounts due.

G.  Referrals to Fund Counsel
    1.  The following shall result in a matter being turned over to Fund Counsel:
        a.  Employer Contributions and Contribution Reports are not received by the Funds within sixty days of the last day of the month in which the work was performed;
        b.  A Contributing Employer fails to pay amounts found due and owing pursuant to a payroll audit;
        c.  A Contributing Employer fails to comply with a request for a payroll audit or fails to produce all requested records during the payroll audit;
        d.  A Contributing Employer incurs a balance of liquidated damages greater than $10,000; or
        e.  A Contributing Employer fails to obtain and maintain the appropriate wage and fringe benefit bond.
    2.  Notwithstanding the foregoing, the Funds reserve the right to refer matters to Fund Counsel prior to the timeframe described in Section G(1)(a) above in instances including, but not limited to, the following:
        a.  A Contributing Employer's anticipated delinquency is estimated to exceed $100,000.00;
        b.  The Funds reasonably believe a Contributing Employer is or will shortly be insolvent;

3

    c. The Funds reasonably believe a Contributing Employer is or will shortly be dissolved; or

    d. The Funds reasonably believe a Contributing Employer is engaged in a scheme to fraudulently deprive the Funds of required Contributions.

H. <u>Audits</u>

1. The Funds' payroll auditing procedures are more fully described in the Payroll Compliance Audit Policy ("Audit Policy").

2. The Funds reserve the right to demand a payroll audit for cause or a payroll audit under different timelines than are set forth in the Audit Policy.

I. <u>Payment of Delinquencies</u>

1. The Collection Committee or an individual authorized to act on their behalf may enter into an agreement for payment of a delinquency in installments ("Installment Note").

2. Approval by the Collection Committee of an Installment Note is required should the requesting Contributing Employer have either (a) entered into or (b) made payments on an Installment Note within sixty months prior to the date it wishes to enter into the new Installment Note.

3. An Installment Note whose term exceeds twenty-four months must be approved by the Collection Committee.

4. The down payment on an Installment Note shall include, at a minimum, 20% of the principal amounts owed to the Funds, plus all amounts owed to the affiliated ancillary funds and all delinquent union dues contributions.

5. All owners, officers, managers and/or members of a Contributing Employer requesting an Installment Note must execute a personal guaranty in the entire amount of the Contributing Employer's delinquency.

6. If the amount to be financed pursuant to the Installment Note exceeds $50,000, all owners, officers, and/or managing members of the Contributing Employer must execute a commercial security agreement in favor of the Funds for the entire amount of the delinquency, on behalf of him/herself and on behalf of the Contributing Employer.

7. On a monthly basis, for the longer of twelve months or the pendency of the Installment Note, the Contributing Employer must complete and submit the "Pending and Future Awarded Job Report Form" attesting to all of its pending and future projects.

8. A Contributing Employer sued for any reason by Fund Counsel is required to complete and submit the "Pending and Future Awarded Job Report Form" for a minimum of twelve months after the litigation is resolved.

J. Contribution Credits, Refunds

1. The Collection Committee or an individual authorized to act on their behalf may allow the issuance of a credit up to the total amount of a Contribution should they determine that the Contributing Employer remitted the Contribution due to

4

a mistake of law or fact and that a credit would be appropriate. The determination on the appropriateness of a credit is fully within the discretion of the Collection Committee or the individual authorized to act on their behalf.

2. Employer Contributions shall only be refunded:

    a. if the Contributing Employer's obligation to contribute to the Funds ceases; and

    b. all of the Contributing Employer's liabilities to the Funds are fully paid.

K. The Collection Committee or an individual authorized to act on their behalf are authorized to compromise, arbitrate, settle, adjust, or release any claim, debt, damage action, or undertaking due or owing from or to the Funds on such terms and conditions as they may deem advisable.

***Signature Pages Follow***

5

**IN WITNESS WHEREOF,** the Board of Trustees of the Laborers' Pension Fund hereby adopts the Revised Collection Policy and Procedures on November 11, 2019.

**EMPLOYER TRUSTEES**

Robert F. Hopkins, Jr.

Clifton M. Horn

Karen Elin Johnson

Robert G. Krug

David H. Lorig

Gary Lundsberg

**UNION TRUSTEES**

Anthony Cantone

James P. Connolly

Paul P. Connolly

Shawn Fitzgerald

Charles V. LoVerde, III

6

**IN WITNESS WHEREOF,** the Board of Trustees of the Laborers' Welfare Fund hereby adopts the Revised Collection Policy and Procedures on November 11, 2019.

**EMPLOYER TRUSTEES**

_____
Julie Chamberlin

_____
Charles J. Gallagher

_____
Clifton M. Horn

_____
David H. Lorig

_____
Dennis P. Martin

_____
Anthony J. Riccardi

**UNION TRUSTEES**

_____
James P. Connolly

_____
Martin T. Flanagan

_____
Richard Kuczkowski

_____
Charles V. LoVerde, III

_____
William J. Martin

7

**IN WITNESS WHEREOF,** the Board of Trustees of the Laborers' Retiree Welfare Fund hereby adopts the Revised Collection Policy and Procedures on November 11, 2019.

**EMPLOYER TRUSTEES**

Julie Chamberlin

Charles J. Gallagher

Clifton M. Horn

David H. Long

Dennis P. Martin

Anthony J. Riccardi

**UNION TRUSTEES**

James P. Connolly

Martin T. Flanagan

Richard Kuczkowski

Charles V. LoVerde, III

William J. Martin

8

Williams Tunneling Industries, Inc.
100 S. 4th St., Suite 550
Saint Louis, MO 63102-189

Employer Number:35608

February 1, 2020 through June 30, 2024



1

## Laborers' District Council
## Reconciliation of Differences Per Year

| Fiscal Year Ending | 5-31-2019 | 5-31-2020 | 5-31-2021 | 5-31-2022 | 5-31-2023 | 5-31-2024 | Total Due |
|---|---|---|---|---|---|---|---|
| **Fringe Hours Not Reported** | - | - | 2.00 | - | 161.00 | 205.00 | 368.00 |
| **Dues Hours Not Reported** | - | - | - | - | - | - | - |
| **Dues Wages Not Reported** | - | - | - | - | - | - | - |
| **Dollar Amount Due** | | | | | | | |
| Welfare (Active) | | | 21.70 | - | 1,899.80 | 2,439.50 | 4,361.00 |
| Welfare (Retiree) | | | 10.50 | - | 845.26 | 1,121.36 | 1,977.12 |
| Pension | | | 28.42 | - | 2,448.82 | 3,261.56 | 5,738.80 |
| Training | | | 1.80 | - | 144.90 | 186.56 | 333.26 |
| IAF - MARBA | | | 0.14 | - | 11.28 | 14.36 | 25.78 |
| CISCO - MARBA | | | 0.02 | - | 1.62 | 2.06 | 3.70 |
| LECET | | | - | - | - | - | - |
| LDCLMCC | | | - | - | - | - | - |
| Working Dues | | | - | - | - | - | - |
| **Total** | $ - | $ - | $ 62.58 | $ - | $ 5,351.68 | $ 7,025.40 | $ 12,439.66 |

| | |
|---|---|
| Plus previous late charges and penalties assessed by Laborers' Pension and Welfare Funds | $ - |
| Plus previous underpayments incurred to Laborers' District Council Funds | $ - |
| Plus previous penalties incurred to Laborers' District Council Funds | $ - |
| Audit Fee | $ 4,627.00 |
| **Total Amount Due** | $ 17,066.66 |

| | | | |
|---|---|---|---|
| **Employer Name:** | Williams Tunneling Industries, Inc. | **Person Contacted:** | Edison Williams |
| **Employer #:** | 35608 | **Date of Contact:** | March 28, 2024 |
| **Date of Audit:** | October 23, 2024 | **Telephone:** | (832) 889-1468 |
| **Audit Period :** | February 1, 2020 through June 30, 2024 | **Auditor:** | Phoebe Newton |

5

# Laborers' District Council
## Schedule of Deficiencies

Employer Name: Williams Tunneling Industries, Inc.
Employer Number: 35608
Agreement Type: IMARBA

Audit Period: February 1, 2020 through June 30, 2024
Date of Audit: October 23, 2024
Field Auditor: Phoebe Newton

| SSN | Name | | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 2020 | | | | | | 2021 | | | |
| 000-00● | PECK, WILLIAM M | Fringe Hours | | | | | | | | | | | | 2.00 | 2.00 |
| | | Dues Hours | | | | | | | | | | | | - | - |
| | | Dues Wages | | | | | | | | | | | | - | - |

| | | May | Total |
|---|---|---|---|
| Total Fringe Hours | | 2.00 | 2.00 |
| Total Dues Hours | | - | - |
| Total Wages | | - | - |

| | Rate | Total |
|---|---|---|
| Welfare (Active) | $10.85 | 21.70 |
| Welfare (Retiree) | $5.25 | 10.50 |
| Pension | $14.21 | 28.42 |
| Training | $0.90 | 1.80 |
| IAF - MARBA | $0.07 | 0.14 |
| CISCO - MARBA | $0.01 | 0.02 |
| LECET | $0.07 | |
| LDCLMCC | $0.17 | |
| Working Dues | 3.75% | |
| **SHEET TOTAL** | | **62.58** |

# Laborers' District Council
Schedule of Deficiencies

Employer Name: Williams Tunneling Industries, Inc.
Employer Number: 35608
Agreement Type: IMARBA

Audit Period: February 1, 2020 through June 30, 2024
Date of Audit: October 23, 2024
Field Auditor: Phoebe Newton

| SSN | Name | | Jun | Jul | Aug | Sep 2022 | Oct | Nov | Dec | Jan | Feb | Mar 2023 | Apr | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 000-00-_ | DRESBACH, BRIAN KIETH | Fringe Hours | | | 48.50 | | | | | | | | | 52.50 | 101.00 |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | - | | | | | | | | | - | - |
| 000-00-_ | PECK, WILLIAM M | Fringe Hours | | | | | | | | | | | | 60.00 | 60.00 |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | - | | | | | | | | | - | - |
| | | Fringe Hours | | | | | | | | | | | | | - |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | | | | | | | | | | | - |
| | | Fringe Hours | | | | | | | | | | | | | - |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | | | | | | | | | | | - |
| | | Fringe Hours | | | | | | | | | | | | | - |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | | | | | | | | | | | - |
| | | Fringe Hours | | | | | | | | | | | | | - |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | | | | | | | | | | | - |
| | | Fringe Hours | | | | | | | | | | | | | - |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | | | | | | | | | | | - |
| | | Fringe Hours | | | | | | | | | | | | | - |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | | | | | | | | | | | - |
| | | Fringe Hours | | | | | | | | | | | | | - |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | | | | | | | | | | | - |
| | | Fringe Hours | | | | | | | | | | | | | - |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | | | | | | | | | | | - |

| | | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Fringe Hours | | - | - | 48.50 | | - | - | - | - | - | - | - | 112.50 | 161.00 |
| Total Dues Hours | | - | - | - | | - | - | - | - | - | - | - | - | - |
| Total Wages | | - | - | - | | - | - | - | - | - | - | - | - | - |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Welfare (Active) | $11.80 | | | 572.30 | | | | | | | | | 1,327.50 | 1,899.80 |
| Welfare (Retiree) | $5.25 | | | 254.63 | | | | | | | | | 590.63 | 845.26 |
| Pension | $15.21 | | | 737.69 | | | | | | | | | 1,711.13 | 2,448.82 |
| Training | $0.90 | | | 43.65 | | | | | | | | | 101.25 | 144.90 |
| IAF - MARBA | $0.07 | | | 3.40 | | | | | | | | | 7.88 | 11.28 |
| CISCO - MARBA | $0.01 | | | 0.49 | | | | | | | | | 1.13 | 1.62 |
| LECET | $0.07 | | | - | | | | | | | | | - | - |
| LDCLMCC | $0.17 | | | - | | | | | | | | | - | - |
| Working Dues | 3.75% | | | - | | | | | | | | | - | - |
| SHEET TOTAL | | | | 1,612.16 | | | | | | | | | 3,739.52 | 5,351.68 |

# Laborers' District Council
## Schedule of Deficiencies

Employer Name: Williams Tunneling Industries, Inc.
Employer Number: 35608
Agreement Type: IMARBA

Audit Period: February 1, 2020 through June 30, 2024
Date of Audit: October 23, 2024
Field Auditor: Phoebe Newton

| SSN | Name | | Jun | Jul | Aug | 2023 Sep | Oct | Nov | Dec | Jan | Feb | Mar | 2024 Apr | May | Total |
|-----|------|--|-----|-----|-----|----------|-----|-----|-----|-----|-----|-----|----------|-----|-------|
| 000-00- | DRESBACH, BRIAN KIETH | Fringe Hours | | 22.50 | 70.00 | | | | | | | | | | 92.50 |
| | | Dues Hours | | - | | | | | - | - | | - | | - | - |
| | | Dues Wages | | - | | | | | | | | | | | - |
| 000-00- | PECK, WILLIAM M | Fringe Hours | | | 52.50 | | | | | | | | 60.00 | | 112.50 |
| | | Dues Hours | | - | - | | | | | | | | - | | - |
| | | Dues Wages | | | - | | | | | | | | - | | - |
| | | Fringe Hours | | | | | | | | | | | | | - |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | | | | | | | | | | | - |
| | | Fringe Hours | | | | | | | | | | | | | - |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | | | | | | | | | | | - |
| | | Fringe Hours | | | | | | | | | | | | | - |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | | | | | | | | | | | - |
| | | Fringe Hours | | | | | | | | | | | | | - |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | | | | | | | | | | | - |
| | | Fringe Hours | | | | | | | | | | | | | - |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | | | | | | | | | | | - |
| | | Fringe Hours | | | | | | | | | | | | | - |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | | | | | | | | | | | - |
| | | Fringe Hours | | | | | | | | | | | | | - |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | | | | | | | | | | | - |
| | | Fringe Hours | | | | | | | | | | | | | - |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | | | | | | | | | | | - |
| | | Fringe Hours | | | | | | | | | | | | | - |
| | | Dues Hours | | | | | | | | | | | | | - |
| | | Dues Wages | | | | | | | | | | | | | - |

| | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Total |
|--|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| Total Fringe Hours | - | 22.50 | 122.50 | - | - | - | - | - | - | - | 60.00 | - | 205.00 |
| Total Dues Hours | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Wages | - | - | - | - | - | - | - | - | - | - | - | - | - |

| | | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Total |
|--|--|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|-------|
| Welfare (Active) | $11.90 | - | 267.75 | 1,457.75 | - | - | - | - | - | - | - | 714.00 | - | 2,439.50 |
| Welfare (Retiree) | $5.47 | - | 123.08 | 670.08 | - | - | - | - | - | - | - | 328.20 | - | 1,121.36 |
| Pension | $15.91 | - | 357.98 | 1,948.98 | - | - | - | - | - | - | - | 954.60 | - | 3,261.56 |
| Training | $0.91 | - | 20.48 | 111.48 | - | - | - | - | - | - | - | 54.60 | - | 186.556 |
| IAF - MARBA | $0.07 | - | 1.58 | 8.58 | - | - | - | - | - | - | - | 4.20 | - | 14.36 |
| CISCO - MARBA | $0.01 | - | 0.23 | 1.23 | - | - | - | - | - | - | - | 0.60 | - | 2.06 |
| LECET | $0.07 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| LDCLMCC | $0.19 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Working Dues | 3.75% | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **SHEET TOTAL** | | - | 771.10 | 4,198.10 | - | - | - | - | - | - | - | 2,056.20 | - | 7,025.40 |

# LABORERS' PENSION & WELFARE FUNDS

## SUMMARY OF AMOUNTS OWED

Audit Period: February 1, 2020 through June 30, 2024

EMPLOYER: Williams Tunneling Industries, Inc.

CODE 35608

5/12/25

| PERIOD | FRINGE HOURS | DUES HOURS | WELFARE | RATE | RETIREE WELFARE | RATE | PENSION | RATE | TRAINING FUND | RATE | DUES | LDCLMCC | RATE | LECET | RATE | MARBA IAF | RATE | MARBA CISCO | RATE | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 6-1-10 to 5-31-11 | | | | 10.63 | | | | 8.57 | | 0.45 | | | 0.12 | | 0.07 | | 0.07 | | 0.01 | |
| 6-1-11 to 5-31-12 | | | | 12.18 | | | | 8.82 | | 0.45 | | | 0.12 | | 0.07 | | 0.07 | | 0.01 | |
| 6-1-12 to 5-31-13 | | | | 12.78 | | | | 9.02 | | 0.50 | | | 0.12 | | 0.07 | | 0.07 | | 0.01 | |
| 6-1-13 to 5-31-14 | | | | 13.38 | | | | 9.52 | | 0.50 | | | 0.12 | | 0.07 | | 0.07 | | 0.01 | |
| 6-1-14 to 5-31-15 | | | | 9.98 | | 3.80 | | 10.12 | | 0.50 | | | 0.12 | | 0.07 | | 0.07 | | 0.01 | |
| 6-1-15 to 5-31-16 | | | | 9.98 | | 4.00 | | 10.72 | | 0.50 | | | 0.17 | | 0.07 | | 0.07 | | 0.01 | |
| 6-1-16 to 5-31-17 | | | | 9.98 | | 4.25 | | 11.57 | | 0.50 | | | 0.17 | | 0.07 | | 0.07 | | 0.01 | |
| 6-1-17 to 5-31-18 | | | | 10.15 | | 4.50 | | 12.32 | | 0.50 | | | 0.17 | | 0.07 | | 0.07 | | 0.01 | |
| 6-1-18 to 5-31-19 | | | | 10.15 | | 4.75 | | 12.57 | | 0.72 | | | 0.17 | | 0.07 | | 0.07 | | 0.01 | |
| 6-1-19 to 5-31-20 | | | | 10.15 | | 4.84 | | 13.61 | | 0.90 | | | 0.17 | | 0.07 | | 0.07 | | 0.01 | |
| 6-1-20 to 5-31-21 | 2.00 | | 21.70 | 10.85 | 10.50 | 5.25 | 28.42 | 14.21 | 1.80 | 0.90 | | | 0.17 | | 0.07 | 0.14 | 0.07 | 0.02 | 0.01 | 62.58 |
| 6-1-21 to 5-31-22 | | | | 11.30 | | 5.25 | | 14.71 | | 0.90 | | | 0.17 | | 0.07 | | 0.07 | | 0.01 | |
| 6-1-22 to 5-31-23 | 161.00 | | 1,899.80 | 11.80 | 845.26 | 5.25 | 2,448.82 | 15.21 | 144.90 | 0.90 | | | 0.17 | | 0.07 | 11.28 | 0.07 | 1.62 | 0.01 | 5,351.68 |
| 6-1-23 to 5-31-24 | 205.00 | | 2,439.50 | 11.90 | 1,121.36 | 5.47 | 3,261.56 | 15.91 | 186.56 | 0.91 | | | 0.19 | | 0.07 | 14.36 | 0.07 | 2.06 | 0.01 | 7,025.40 |
| SUBTOTAL | 368.00 | | 4,361.00 | | 1,977.12 | | 5,738.80 | | 333.26 | | | | | | | 25.78 | | 3.70 | | 12,439.66 |
| 10% LIQUIDATED DAMAGES | | | | | | | | | | | | | | | | | | | | |
| 20% LIQUIDATED DAMAGES | | | 872.20 | | 395.42 | | 1,147.76 | | 66.65 | | | | | | | 5.16 | | 0.74 | | 2,487.93 |
| AUDIT COSTS | | | 1,573.18 | | 1,526.91 | | 1,526.91 | | | | | | | | | | | | | 4,627.00 |
| ATTORNEY FEES | | | | | | | | | | | | | | | | | | | | |
| ACCUM. LIQUIDATED DAMAGES | | | | | | | | | | | | | | | | | | | | |
| ACCUM. INTEREST | | | 978.55 | | 442.41 | | 1,282.94 | | 74.81 | | | | | | | 5.79 | | 0.83 | | 2,785.33 |
| TOTAL DUE | | | 7,784.93 | | 4,341.86 | | 9,696.41 | | 474.72 | | | | | | | 36.73 | | 5.27 | | 23,339.92 |
| AUDIT PENALTY REDUCTION FROM 20% TO 10% IF THE AUDIT IS PAID WITHIN 30 DAYS FROM THE DATE OF THE AUDIT COVER LETTER DATED: | | | (436.10) | | (197.71) | | (573.88) | | (33.33) | | | | | | | (2.58) | | (0.37) | | (1,243.97) |
| TOTAL DUE, IF PAID WITHIN 30 DAYS | | | 7,348.83 | | 4,144.15 | | 9,122.53 | | 441.39 | | | | | | | 34.16 | | 4.90 | | 21,095.95 |



EXHIBIT A-9

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CHICAGO & VICINITY LABORERS'          )
DISTRICT COUNCIL PENSION FUND,        )
CHICAGO & VICINITY LABORERS'          )
DISTRICT COUNCIL WELFARE FUND,        )
CHICAGO & VICINITY LABORERS'          )
DISTRICT COUNCIL RETIREE HEALTH       )
AND WELFARE FUND, and CATHERINE       )
WENSKUS, not individually but as      )
Administrator of the Funds,           )
                                      )
                                      )          Case No. 25-cv-6703
                    Plaintiff,        )
        and                           )          JUDGE BLAKEY
                                      )
                                      )
                                      )
WILLIAMS TUNNELING INDUSTRIES,        )
INC., a Missouri corporation          )
                    Defendant.        )

### DECLARATION OF G. RYAN LISKA

I, G. RYAN LISKA, declare under the penalty of perjury that the foregoing is true and

accurate:

1.      I am Fund Counsel for Chicago & Vicinity Laborers' District Council Pension,

Welfare and Retiree Health and Welfare Fund and Catherine Wenskus, Plaintiffs in the above

captioned action. This Declaration is submitted in support of the Funds' Motion for Entry of

Default Judgment pursuant to Rule 55(b).

2.      G. Ryan Liska, in-house counsel for the Funds, received a Bachelor of Arts

Degree from the University of Iowa in 1997 and a Juris Doctor Degree from the John Marshall

Law School in 2002. I was admitted to the bar of the State of Illinois in November of 2002 and

to the bar of the United States District Court for the Northern District of Illinois in December



2002. In March 2006, I was admitted to the bar of the United States District Court for the Central District of Illinois. From 2002 to September 2016, I practiced labor and employment law at Berglund & Niew, P.C. and Berglund Armstrong & Mastny, P.C. In October of 2016, I became in-house counsel for the Laborers' Funds.

3.     Based on the foregoing, $265.00 represents a fair and reasonable market rate for my in-house legal services to the Funds in this matter.

4.     Exhibit B-1 attached hereto sets for the time expanded to date by Fund Counsel on this matter. As set forth in Exhibit, we have expended 5.6 hours totaling $1,484.00 in attorney fees and costs totaling $549.25.

I, the undersigned, certify under penalty of perjury that the foregoing is true and accurate.

Date: 10 - 2 - 2025

G. Ryan Liska

2

Laborers Pension and Welfare Funds
11465 Cermak Rd.
Westchester, IL 60154

Invoice submitted to:
Williams Tunneling

October 2, 2025

Invoice #10474

Professional Services

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 6/17/2025 | GRL | Prepare bond claim and certified mailings; Draft complaint against the Company | 2.90 265.00/hr | 768.50 |
| 8/18/2025 | GRL | Draft  Motion for Default Judgment; Gather exhibits email to VA for filing. | 1.50 265.00/hr | 397.50 |
| 8/19/2025 | GRL | Draft letter to Company re: Motion for Default Judgment | 0.20 265.00/hr | 53.00 |
| 9/17/2025 | GRL | Attend court appearance for motion for default judgment; Travel to and from Court | 1.00 265.00/hr | 265.00 |
| | | For professional services rendered | 5.60 | $1,484.00 |
| | | Additional Charges : | | |
| 6/17/2025 | | Filing fee. | | 403.00 |
| 6/19/2025 | | Service of Summons and Complaint | | 146.25 |
| | | Total additional charges | | $549.25 |
| | | Total amount of this bill | | $2,033.25 |
| | | Balance due | | $2,033.25 |



EXHIBIT
B-1

Williams Tunneling

## Timekeeper Summary

| Name | Hours | Rate | Amount |
|------|-------|------|--------|
| G. Ryan Liska | 5.60 | 265.00 | $1,484.00 |